RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0223p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ANDREI SKRIPKOV,

                      *Petitioner*,

    *v.*

WILLIAM P. BARR, Attorney General,

                      *Respondent*.

No. 19-3922

On Petition for Review from the Board of Immigration Appeals;
No. A 201 355 193.

Argued:  April 27, 2020

Decided and Filed:  July 20, 2020

Before:  GILMAN, DONALD, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Brenna Duncan, PERKINS COIE, LLP, Washington, D.C., for Petitioner.  Arthur L. Rabin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:**  Brenna Duncan, Nathan Kelley, Andrew Caridas, PERKINS COIE, LLP, Washington, D.C., for Petitioner.  Arthur L. Rabin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

     GILMAN, J., delivered the opinion of the court in which DONALD, J., joined. LARSEN, J. (pp. 16–17), delivered a separate opinion concurring in the judgment.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge. Andrei Skripkov, a citizen of Russia, seeks review of a decision by the Board of Immigration Appeals (BIA) upholding an Immigration Judge's (IJ's) denial of his application for asylum and the withholding of removal. Skripkov asserted in his application that he was persecuted in his home country on account of his political opinion. He specifically contended that his anticorruption whistleblowing activities motivated Russian officials to persecute him. The IJ and the BIA, on the other hand, found that the officials were motivated solely by their pecuniary interest in furthering a corrupt scheme disrupted by Skripkov.

In his petition for review, Skripkov argues that the BIA erred in disregarding evidence that he would be criminally prosecuted for his political opinion if he is returned to Russia. For the reasons set forth below, we **GRANT** Skripkov's petition for review and **REMAND** the case to the BIA for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual background

Skripkov is a former civil servant from the Chelyabinsk region of Russia. In 2000, he began working as an event planner for the Chelyabinsk regional government, and in 2008 he was appointed to lead the government enterprise responsible for organizing banquets and mass events in Chelyabinsk. He also served on a commission that oversaw government procurement activities.

Skripkov's anticorruption activism began in 2010, when the president of Russia appointed Mikhail Yurevich as governor of the Chelyabinsk region and Aleksander Ufimtsev as deputy governor. The new regional leadership began directing Skripkov to accept bids from specified suppliers at inflated prices. After Skripkov refused to comply with these directives, Deputy Governor Ufimtsev warned him that "we will find justice on [sic] you." Skripkov began

receiving what he characterized as "[c]onstant threats" for his refusal, causing him to resign from his position within the Chelyabinsk government.

Even after resigning from his position, Skripkov received threatening phone calls from unknown callers and his front door was defaced with messages. These threats caused Skripkov and his wife to sell their home and move in with Skripkov's parents in a different town within Chelyabinsk. After unsuccessful attempts to find a job in his area of expertise, Skripkov began working as a truck driver.

In October 2014, Skripkov learned about a bidding competition held by the government of Chelyabinsk. The competition fell within his former professional purview—procurement activities—so Skripkov's interest was raised. He believed that the "staggering" amount at issue in the bidding competition was unjustified. Skripkov reported the competition to Russia's Federal Antimonopoly Service and to the Prosecutor's Office. Both entities ignored his concerns. He then brought the competition to the attention of the Anti-Corruption Foundation, a prominent watchdog organization led by Russian political activist Alexei Navalny. Governor Yurevich and Deputy Governor Ufimtsev were removed by President Putin in 2015, although the record does not make clear what role, if any, that the Anti-Corruption Foundation or Skripkov's whistleblowing had in their removal.

Skripkov continued to experience threats and mistreatment even after Governor Yurevich and Deputy Governor Ufimtsev were removed from office. In February 2015, someone threw a rock through a window of the house where Skripkov lived with his parents. The next day Skripkov found a crumpled note in his parents' backyard reading: "[Y]ou d[ug] into our business, we will spoil your life." In October 2015, Skripkov found the tires of his car slashed. He discovered in May 2016 that someone had destroyed the goods stored in his truck.

In 2018, Skripkov assumed a more public role as an anticorruption activist. He began volunteering with Navalny's Anti-Corruption Foundation, which in turn led to several arrests by the local police. In January 2018, for instance, Skripkov was detained for two days for handing out leaflets on behalf of the Anti-Corruption Foundation. Skripkov, in his oral testimony, described this arrest as a "pretext." He explained that he had been "there for a lawful, authorized

meeting," yet he had been singled out among "a lot of people" who had attended the meeting. The actual reason for his detention, according to Skripkov, was that he was interfering with the corrupt business interests of the local authorities.

Skripkov was arrested and again detained for two days in February 2018 for his association with an unsanctioned rally. And in May 2018, he was detained at a meeting for organizing an "uncoordinated" rally against Putin. Skripkov explained that he was arrested at this rally for holding a placard proclaiming that Putin was a criminal. One of the officers instructed him to "[t]hink back" to "who does not like you" while Skripkov was being held in police custody.

Finally, in July 2018, Skripkov was detained for participating in another rally held by the Anti-Corruption Foundation. He again described the arrest as a pretext. According to Skripkov, the arresting officers said that they were holding him "to clarify [his] identity." The investigator at the police station asked Skripkov if he "owe[d] someone." He also threatened Skripkov with prosecution under Article 212.1 of the Russian Federation Criminal Code, which, according to Skripkov, allows the government to impose up to a five-year prison sentence on citizens who have been repeatedly arrested in connection with peaceful protests.

Against this backdrop of repeated arrests, Skripkov suffered two incidents of physical violence. In June 2018, three men beat Skripkov outside of his parents' house. The men claimed that they were seeking repayment of a debt arising from several past corrupt-bidding competitions that fell through due to Skripkov's lack of cooperation. They were mostly dressed in civilian clothes, but Skripkov noticed that one of the men was wearing police pants. He also saw that they had a Federal National Guard Troops Service car with them. Skripkov's neighbor helped stop the attack and assisted Skripkov with his injuries. The next day Skripkov went to a hospital's emergency room for stitches. He considered bringing charges against the men, but he was talked out of doing so by his wife.

The second incident of violence occurred in August 2018, when Skripkov was stopped near his parents' house by two of the men who had beaten him in June. These men threatened that Skripkov would be "poisoned for a long time" if he did not "pay a debt." Although the men

were dressed in civilian clothes, Skripkov noticed the same Federal National Guard Troops Service vehicle from the previous incident in June. One of the men punched Skripkov in the face. Skripkov believed that the police had been deployed by the local authorities to collect the "debt" that he purportedly owed for interfering with their corrupt schemes.

This last incident spurred Skripkov and his wife to make plans to move from his parents' house in Chelyabinsk. But before they finalized their plans, they decided to go with their adopted son on a vacation to the United States. Skripkov, while on vacation, received a phone call from his mother explaining that individuals claiming to be child-service workers had come by her house one evening to ask about the whereabouts of Skripkov's son. Because the child-service workers had no reason to visit, and because such visits do not normally occur at night, Skripkov believed that this incident was further harassment by the corrupt authorities. He feared that they would take his adopted son away as further retaliation. Feeling that this was "[t]he last straw," he and his wife decided to remain in the United States and seek asylum.

In December 2018, the Russian government issued an indictment against Skripkov under Article 212 of the Russian Federation Criminal Code. The government also issued two summonses for Skripkov's interrogation in relation to his July 2018 arrest.

**B.      Procedural background**

In December 2018, the Department of Homeland Security initiated removal proceedings against Skripkov. Skripkov filed an asylum application two months later. The IJ who heard Skripkov's case determined that Skripkov's testimony was credible, but nevertheless denied Skripkov's application. Some of the incidents described by Skripkov, in the IJ's view, did not amount to persecution. Considering those incidents that might have amounted to persecution, the IJ found that Skripkov had not shown that the mistreatment was on account of his political beliefs. Rather, the IJ determined that the police officers who threatened, arrested, and beat Skripkov were driven to attack him because he had interfered with their business interests. The IJ specifically noted that "[t]here was no mention of any political party that he supported, or a political cause he favored" during any of Skripkov's detentions or arrests. On this basis, the IJ also determined that Skripkov had no well-founded fear of future persecution. The IJ then

summarily denied Skripkov's withholding-of-removal claim based on Skripkov's failure to meet the requirements for asylum.

In April 2019, Skripkov filed an appeal of the IJ's decision regarding his asylum and withholding-of-removal claims. Skripkov argued that the IJ had failed to consider evidence of his threatened prosecution under Article 212.1 in assessing Skripkov's asylum application. He also submitted evidence of his indictment and summonses under Article 212 in support of this argument.

The BIA dismissed Skripkov's appeal in an opinion affirming the IJ's decision. It determined that the evidence of Skripkov's indictment and summonses under Article 212 was evidence previously available to Skripkov that was submitted for the first time on appeal. The BIA therefore declined to either consider this new evidence or remand the case to the IJ for reconsideration. It also determined that the tendered evidence would "still be insufficient to meet his burden of proof for asylum," a conclusion that the BIA supported with nothing more than a short string of cases cited without any parenthetical explanations. Skripkov filed a timely petition for review of the BIA's decision.

## II. ANALYSIS

### A.     Standard of review

"Where the Board affirms the IJ's ruling but adds its own comments, we review both the IJ's decision and the Board's additional remarks." *Karimijanaki v. Holder*, 579 F.3d 710, 714 (6th Cir. 2009). Factual findings, whether made by the Board or the IJ, are reviewed under the deferential substantial-evidence standard, "meaning that the findings are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Pablo-Sanchez v. Holder*, 600 F.3d 592, 594 (6th Cir. 2010) (quoting 8 U.S.C. § 1252(b)(4)(B)). We review questions of law, on the other hand, de novo. *Umaña-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013). Because the IJ in the present case found that Skripkov was credible, Skripkov's factual statements should be accepted as true. *See Al-Ghorbani v. Holder*, 585 F.3d 980, 991 (6th Cir. 2009).

**B.** **Asylum claim**

"An applicant for asylum must demonstrate that [he] is a refugee as defined by the [Immigration and Nationality Act (INA)]." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004). To prove his refugee status, the applicant must show that he is "unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of" his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). In order to satisfy this "on account of" requirement (i.e., a "nexus"), the applicant must show that at least one of these characteristics "was or will be at least one central reason for [his persecution]." 8 U.S.C. § 1158(b)(1)(B)(i).

Activism against government corruption, such as that claimed by Skripkov, has been held to constitute a political opinion. *See Bu v. Gonzales*, 490 F.3d 424, 431–32 (6th Cir. 2007) (holding that a petitioner who organized protests against government corruption had articulated a political opinion under the INA); *Wang v. Mukasey*, 259 F. App'x 763, 764 (6th Cir. 2008) (holding that a petitioner's protest activity against government corruption constituted a political opinion). Both the IJ and the BIA applied the three-step analysis described in *Matter of N-M-*, 25 I.&N. Dec. 526 (BIA 2011), to determine whether Skripkov's anticorruption activity was "one central reason" for his persecution. Under this analysis, the factfinder considers (1) "whether and to what extent the alien engaged in activities that could be perceived as expressions of anticorruption beliefs"; (2) "any direct or circumstantial evidence that the alleged persecutor was motivated by the alien's perceived or actual anticorruption beliefs"; and (3) "evidence regarding the pervasiveness of government corruption, as well as whether there are direct ties between the corrupt elements and higher level officials." *Id.* at 532–33.

In the case before us, we conclude that substantial evidence supports the IJ's factual determination that "the[] individuals who threatened him were upset with [Skripkov] because he refused to go along with their corruption scheme and reported them, which caused them to lose money." But the IJ's inference that this "evidence only supports a finding that the police were motivated by pecuniary reasons and not political" fails to take into account the obvious connection between the officers' corrupt scheme and Skripkov's anticorruption activities. In

other words, the question is whether the officers lost money precisely because of Skripkov's political opinion against corruption.

The BIA did no better in explaining why it ignored Skripkov's argument that his threatened prosecution under Article 212.1 of the Russian Federation Criminal Code was evidence of persecution for his political opinion. This evidence, unlike the actual indictment and summonses documents, was provided by Skripkov in his original asylum application and during his hearing. But neither the IJ nor the BIA made any mention of the threatened prosecution. And aside from its string cite to several distinguishable cases, the BIA offered no explanation at all for its conclusion that the indictment and summonses would not change the outcome of Skripkov's asylum claim. This absence of analysis is all the more puzzling because we appear to have before us a classic mixed-motive case where a petitioner's alleged persecutors are motivated both by a protected ground and other, nonprotected grounds, such as personal pecuniary gain. *See Stserba v. Holder*, 646 F.3d 964, 972–73 (6th Cir. 2011) (noting that, in mixed-motive cases, the petitioner "is eligible for asylum or the withholding of removal so long as *one* of the factors motivating the persecution is a protected ground under the INA") (citation and brackets omitted) (emphasis in original). The two motives in the present case strike us as inextricably intertwined, being two sides of the same coin.

Under these circumstances, where neither the IJ nor the BIA have given a reasoned explanation for their decisions, we are not obliged to give those decisions deference. *See Berhane v. Holder*, 606 F.3d 819, 825 (6th Cir. 2010) (holding that deference "does not require upholding a Board decision without regard to whether there is a reasoned basis for it"); *see also Castro v. Holder*, 597 F.3d 93, 99 (2d Cir. 2010) (concluding that substantial evidence "requires a certain minimum level of analysis from the IJ and BIA, as well as some indication that the IJ considered material evidence supporting a petitioner's claim") (citation and internal quotation marks omitted).

An apt analogy might help clarify the two-sides-of-the-same-coin point made above. Assume that a game warden in a wildlife preserve is himself poaching elephants in a corrupt scheme to illegally export their ivory tusks. Along comes a citizen—an active member of an anticorruption league with a special focus on elephant poaching—whose activities are adversely

affecting the warden's illicit moneymaking scheme. In order to protect the warden's pecuniary interest, the warden threatens to charge the citizen with the crime of trespassing in the game preserve without a permit. Under these circumstances, is the warden's motive to protect his pecuniary interest completely divorced from his desire to eliminate the citizen's anticorruption (i.e., political) activities when the warden threatens to charge the citizen with a crime closely related to the illegal poaching? Or are the warden's twin goals inseparable? The IJ's and the BIA's failure to consider the equivalent nexus between Skripkov's anticorruption activities and the Russian officers' corrupt scheme is precisely why this case needs to be reevaluated on remand.

### 1.    *The context and substance of the threatened prosecution*

In support of the BIA's conclusion that the indictment and summonses would be insufficient to meet Skripkov's burden of proof for asylum, it cited *Cruz-Samayoa v. Holder*, 607 F.3d 1145 (6th Cir. 2010). The BIA apparently relied on the general rule articulated in *Cruz-Samayoa* that "persecution does not exist where the law that the native country seeks to enforce in its criminal prosecution is 'generally applicable.'" *Id*. at 1151 (quoting *Saleh v. U.S. Dep't of Justice*, 962 F.2d 234, 239 (2d Cir. 1992)). But the court in *Cruz-Samayoa* also identified several exceptions to the general rule that prosecution does not equal persecution, so the question is whether the general rule should apply to threatened prosecution under Article 212.1.

"A petitioner may [] establish that prosecution reaches the level of persecution," for instance, "if the individual can demonstrate that the prosecution or criminal investigation 'was actually pretext for persecution' on account of one of the INA's enumerated grounds." *Id*. (quoting *Lakaj v. Gonzales*, 158 F. App'x 678, 683 (6th Cir. 2005)). To determine if a threatened prosecution was pretextual, we look to both the context and the substance of the law that the home country is attempting to enforce. *Id*. In Skripkov's case, however, the BIA discussed neither the context in which Skripkov was threatened with prosecution under Article 212.1 nor the substance of the offense. This lack of discussion persisted despite the fact that Skripkov repeatedly referred to his arrests as a "pretext." The BIA's omission was in error. As explained below, considerations of both context and substance suggest that the officers were not simply enforcing a "generally applicable" law against Skripkov in a disinterested manner.

**(a) Context.** To assess the context in which a law is enforced, we look to whether the government was acting as a "disinterested enforcer of neutral laws." *Li Wu Lin v. I.N.S.*, 238 F.3d 239, 245 (3d Cir. 2001). The case of *Jin Jin Long v. Holder*, 620 F.3d 162 (2d Cir. 2010), which was cited by the BIA as a contrasting comparator, provides guidance here. In *Jin Jin Long*, the petitioner claimed that the refugee-smuggling charges brought against him were fabricated, and that he was never brought before a judge or formally charged with a crime. Jin Jin Long was released from jail, moreover, only after his wife paid a fee demanded by his captors. The Second Circuit acknowledged that enforcement of generally applicable laws usually does not amount to persecution, but it also explained that "someone who has been singled out for enforcement or harsh punishment because of his political opinion can show eligibility" for asylum. *Id*. at 166. Because the BIA did not consider the facts as laid out by Jin Jin Long in this context, the court remanded the petition to the BIA for reevaluation in the first instance. *Id.* at 167–68.

From the record before us, Skripkov's threatened prosecution under Article 212.1 appears to be no less pretextual than the charges brought against the petitioner in *Jin Jin Long*. Skripkov was allegedly singled out for arrest at several of the protests that he organized or attended, and one of the officers reminded Skripkov after the May 2018 arrest to "[t]hink back" to "who does not like you." This arrest also served as a basis for the officer's threat to prosecute Skripkov under Article 212.1. The officer who threatened Skripkov with prosecution, moreover, suggested that Skripkov "owed" someone. The BIA's unexplained conclusion that Skripkov's case is distinguishable from *Jin Jin Long* therefore appears to be unfounded.

**(b) Substance.** We now turn to the substance of Article 212.1 of the Russian Federation Criminal Code. Prosecution for "political crimes"—such as for peaceful protest—has been held to constitute evidence of persecution under the INA. In *Perkovic v. I.N.S.*, 33 F.3d 615 (6th Cir. 1994), for instance, petitioners from Yugoslavia were determined to have been persecuted because they were charged with political crimes under Yugoslav law. The court made particular note of the "abundant evidence . . . that [the petitioners] committed acts both [in the United States] and in Yugoslavia that, although protected under international human rights law, are considered political crimes in their homeland." *Id.* at 622. These crimes included

"peaceful expression of dissenting political opinion, the mere possession of Albanian cultural artifacts, the exercise of citizens' rights to petition their government, and the association of individuals in political groups with objectives of which the government does not approve." *Id*; *see also Palushaj v. I.N.S.*, 25 F.3d 1049, 1994 WL 198169, at *2 (6th Cir. 1994) (table) (explaining that criminal charges of "counterrevolution" can amount to persecution because "counterrevolution" is a classic political crime).

In the present case, Article 212.1 similarly penalizes protest activity that is not approved through government channels. Skripkov, in his brief before the BIA, referred to Article 212.1 as "one of the most notorious tools of government repression of dissent in Russia." But neither the IJ nor the BIA discussed Skripkov's assertion that Article 212.1 is an instrument of government repression.

This failure is especially perplexing in light of the two ostensibly supportive cases cited by the BIA: *Cruz-Samayoa v. Holder*, 607 F.3d 1145 (6th Cir. 2010), and *Matter of Maccaud*, 14 I.&N. Dec. 429 (BIA 1973). In *Cruz-Samayoa*, this court determined that an asylum applicant who was charged with "murder, attempted murder, serious injuries, sedition, public intimidation, instigation to commit crimes, illegal grouping of armed people, assault, resistance with specific aggravations, and disobedience" did not establish that his prosecution under Guatemalan law amounted to persecution. 607 F.3d at 1152. Of particular relevance to the court's analysis was that "many, if not all, of the charges would constitute crimes under the laws of the United States." *Id.* Similarly, the petitioner in *Matter of Maccaud* was charged under Canadian law with escaping from jail and violating parole. 14 I.&N. Dec. at 434.

The BIA apparently concluded, without any explanation, that Skripkov's case is analogous to *Cruz-Samayoa* and *Matter of Maccaud*. We believe that just the opposite is true. Although most of the charges brought against the petitioners in *Cruz-Samayoa* and *Matter of Maccaud* have direct analogues in United States criminal law, Article 212.1 has no such equivalent. In sum, both the context and substance of Skripkov's threatened prosecution under Article 212.1 appear to be pretextual, thus crossing the line from prosecution to persecution.

## 2. *The "nexus" requirement*

Proof of persecution *per se*, however, is not sufficient to entitle Skripkov to asylum relief. Even if the IJ and the BIA conclude on remand that the Russian officer's threat to prosecute Skripkov under Article 212.1 was indeed pretextual, Skripkov must still demonstrate a "nexus" between his anticorruption activism and his alleged persecution in order to be eligible for asylum under 8 U.S.C. §§ 1101(a)(42)(A) and 1158(b)(1)(B)(i). The question remains, therefore, whether the IJ and the BIA erred in determining that the Russian officers were motivated solely by their pecuniary interest rather than by Skripkov's political opinion.

This court has established that, "[i]n order to demonstrate that an applicant has been persecuted on account of a political opinion or membership in a particular social group, it is not enough to present evidence that the applicant *had* a political opinion or *was* a member of that social group." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (emphasis in original). The petitioner must instead demonstrate that he was persecuted "on account of" his political opinion. 8 U.S.C. § 1101(a)(42)(A). His political opinion, furthermore, must be "at least one central reason" for his persecution. 8 U.S.C. § 1158(b)(1)(B)(i).

True enough, "simply demonstrating resistance to pressure to engage in certain acts and consequent retaliation for this resistance is insufficient to establish a nexus" in the anticorruption context. *Matter of N-M-*, 25 I.&N. Dec. 526, 529 (BIA 2011). The BIA has recognized that an

> automatic equation between retaliatory harm and the motivation behind the retaliation . . . would fail to recognize corrupt officials who act solely out of personal revenge or a desire to avoid the exposure of a lucrative scheme of corruption, without a significant concern about the alien's political beliefs, perceived or otherwise.

*Id*. at 531–32.

But the relevant inquiry here is not whether Skripkov's assailants were motivated *by their own* political opinions. Rather, the question is whether the assailants targeted Skripkov on account of *Skripkov's* political opinion. *See I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 482 (1992) ("The ordinary meaning of the phrase 'persecution on account of . . . political opinion' . . . is persecution on account of the *victim's* political opinion, not the persecutor's.") (emphasis in

original).  And Skripkov argues that the disregarded evidence of his threatened prosecution under Article 212.1 provides proof that his assailants were motivated, at least in part, by Skripkov's political opinion.

We agree.  The substance of Article 212.1 moves Skripkov's case from the sphere of private retaliation into the sphere of political repression.  Indeed, the evidence of threatened prosecution shows that the officers who assailed Skripkov were aware of his political opinion.  One can also infer that the officers were seeking to punish Skripkov's acts of protest against the government.  If the corrupt officers saw Skripkov's political activities as objectionable, then they cannot be said to have acted "without a significant concern about [Skripkov's] political beliefs." *See Matter of N-M-*, 25 I.&N. Dec. at 531–32.  The facts surrounding Skripkov's final arrest therefore provide circumstantial evidence that the officers were motivated, at least in part, by Skripkov's political opinion.  *See Elias-Zacarias*, 502 U.S. at 483 (explaining that a persecutor's motive may be established through circumstantial evidence).

Moreover, Skripkov's public stance against government corruption, culminating in the threatened prosecution under Article 212.1, distinguishes his case from others in this circuit.  The government's citation to *Khozhaynova v. Holder*, 641 F.3d 187 (6th Cir. 2011), is illustrative.  In *Khozhaynova*, a Russian store owner claimed to have been persecuted on the basis of her political opinion because she refused to give in to extortion demands.  The court concluded that it was "just as likely, if not more likely, that assailants targeted Khozhaynova because of her perceived wealth as a store owner" than because of her political opinion.  *Id*. at 196.  Of particular significance is the fact that Khozhaynova provided "no evidence that she [was] politically active in any other way than by running a business, nor [did] she establish that her persecutors interpreted her refusal to pay extortion demands as an articulation of her political opinion."  *Id*.  Unlike the assailants in *Khozhaynova*, Skripkov's assailants knew that Skripkov was politically active, as evidenced by the threat to charge him under Article 212.1.

The present case is likewise distinguishable from numerous other cases from this court in which petitioners refused to comply with corrupt government schemes but failed to meet the asylum statute's nexus requirement.  *See, e.g.*, *Petrosyan v. Holder*, 558 F. App'x 519, 525 (6th Cir. 2014) (explaining that the petitioner "provide[d] no evidence that he is politically active in

any other way than by running a business"); *Popovych v. Holder*, 470 F. App'x 446, 450 (6th Cir. 2012) (noting that the petitioner "never attempted to expose corruption to the public or another government body"); *Zoarab v. Mukasey*, 524 F.3d 777, 782 (6th Cir. 2008) (stating that the petitioner did not present any evidence that anyone "knew or should have know[n] that [he] was even opposed to government corruption or had any other political opinion") (citation omitted); *Marku v. Ashcroft*, 380 F.3d 982, 987 (6th Cir. 2004) (explaining that the petitioner "presented no evidence that she ever denounced corruption in public or at work").

In cases such as those cited above, where a petitioner seeks asylum after refusing to take part in a corrupt government scheme, the corrupt officials will almost always be motivated, at least in part, by their own pecuniary interest. But where, as in Skripkov's case, a petitioner's anticorruption activities manifest themselves through acts of public protest, the government officials' pecuniary interest and their desire to quell the petitioner's political activities typically become inseparable. An out-of-circuit case, *Marquez v. I.N.S.*, 105 F.3d 374 (7th Cir. 1997), clearly illustrates this nexus. Although the court in *Marquez* determined that the petitioner there was not persecuted on account of his anticorruption activities, it established guideposts for when circumstantial evidence would lead to the conclusion that an individual was so persecuted:

> Suppose that [the petitioner] had founded an anticorruption political party, or assumed an active role in one. Or that he had spoken out repeatedly as a public gadfly about reforming a corruption-ridden government. Suppose further that governmental agents then burgled his house, roughed him up, threatened his wife at work, wrecked his drinking well, threw him in jail and harassed his children—all within a short span of time. We think that scenarios like these would give us more confidence that [the petitioner] had been persecuted on account of political opinion.

*Id.* at 381.

Bingo! The circumstances described in *Marquez* are essentially the circumstances here. Skripkov refused to comply with a regional government's corrupt scheme, reported the corruption after leaving his role in that government, and took on a public role with Navalny's Anti-Corruption Foundation. This role was clearly known to Skripkov's assailants, who arrested him at protests that he helped organize. The physical abuse from the officers occurred when Skripkov became more active with the Anti-Corruption Foundation. Finally—and critically—

the evidence of Skripkov's threatened prosecution under Article 212.1 provides a strong inference that the officers sought to suppress his political activities. The officers' pecuniary interest, in other words, appears to be inextricably intertwined with their objections to Skripkov's anticorruption political opinion.

On the basis of the caselaw from this court and others, we therefore conclude that the BIA erred in disregarding the evidence of Skripkov's threatened prosecution under Article 212.1. We accordingly vacate the BIA's decision and remand for reconsideration.

**C.      Withholding-of-removal claim**

Skripkov also challenges the IJ's statement that "[b]ecause respondent has failed to show the lesser relief for asylum, he has also failed to show that he would be entitled to withholding of removal under the Act." According to Skripkov, the IJ erred in applying the asylum statute's "one central reason" standard, stated in 8 U.S.C § 1158(b)(1)(B)(i), to his withholding-of-removal claim. But the IJ could alternatively have determined that Skripkov's withholding-of-removal claim automatically failed because withholding of removal requires a showing of a "clear probability" of persecution—a more stringent standard than for asylum claims. *See Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir. 2005) (citation omitted). We find no indication in the record that the IJ based his determination on the "one central reason" standard. To the extent that the IJ did rely on the asylum statute's "one central reason" standard, however, the IJ will, on remand, have to take into account this court's recent decision in *Guzman-Vazquez v. Barr*, No. 19-3417 (6th Cir. May 18, 2020), holding that the "one central reason" standard does not apply to withholding-of-removal claims.

**III. CONCLUSION**

For all of the reasons set forth above, we **GRANT** Skripkov's petition for review and **REMAND** the case to the BIA for further proceedings consistent with this opinion.

---

**CONCURRING IN THE JUDGMENT**

---

LARSEN, Circuit Judge, concurring in the judgment.  A person's eligibility for asylum turns, in part, on the subjective motivations of his persecutors.  *See INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992); *see also* 8 U.S.C. § 1101(a)(42) and 1158(b)(1)(A) (authorizing the grant of asylum to persons subject to persecution "on account of" a protected trait).  If his persecutors were "motivated by a particular animus" toward his race, religion, nationality, membership in a particular social group, or political opinions, then he may be eligible for asylum.  *See Cruz-Guzman v. Barr*, 920 F.3d 1033, 1037 (6th Cir. 2019).  If, instead, his persecutors' motives were "purely personal," he is ineligible for asylum and may be subject to removal.  *Marku v. Ashcroft*, 380 F.3d 982, 988 (6th Cir. 2004).

This simple inquiry becomes more challenging when the persecutors' motives were "mixed."  *See Guzman-Vazquez v. Barr*, 959 F.3d 253, 270 (6th Cir. 2020).  In such cases, the applicant must establish that his protected trait was "at least one central reason" for his persecution.  8 U.S.C. § 1158(b)(1)(B)(i).  The factfinder's task, then, is to determine whether the applicant's protected trait was a "central" motivation for the persecution, *see id.*, rather than merely "incidental, tangential, superficial, or subordinate to another reason for the harm."  *See Lopez-Arias v. Barr*, 777 F. App'x 793, 796 (6th Cir. 2019) (citation omitted).

The challenge is further compounded when the protected trait asserted by the applicant is a political opinion against government corruption.  Persecution motivated by greed, lost profits, or "the financial demands of criminal corruption" is insufficient.  *See Khozhaynova v. Holder*, 641 F.3d 187, 196 (6th Cir. 2011).  Yet, as the majority notes, it is easy for those motives to appear "inextricably intertwined" with animus against the applicant's anti-corruption political beliefs.  *See* Maj. Op. at 8.  Sometimes the persecutors will have lost money "precisely because of [the applicant's] political opinion against corruption."  *See id.*  The question in such cases is "whether the persecutor[s] w[ere] attempting to suppress a challenge to the governing institution," or merely "attempting to suppress a challenge . . . to isolated, aberrational acts of greed or malfeasance."  *Zhang v. Gonzales*, 426 F.3d 540, 548 (2d Cir. 2005) (Sotomayor, J.).

In this case, the BIA and IJ determined that Skripkov's persecutors were "motivated *only* by pecuniary reasons, not by political ones."  At first glance, that conclusion seems reasonable. Skripkov testified that his anti-corruption leafletting was merely a "pretext" for his arrests and that, instead, the Russian police persecuted him because he "interfer[ed] with their business interests."  He elaborated, "There were a lot of people that had . . . the [anti-corruption] fliers, but I was the one who would get stopped."  That testimony would normally end our inquiry.  The BIA and IJ's factual findings are conclusive "unless any reasonable adjudicator would be *compelled* to conclude to the contrary."  *See* 8 U.S.C. § 1252(b)(4)(b) (emphasis added).  Surely, a reasonable adjudicator would not be compelled to disregard Skripkov's own testimony.

But Skripkov also testified that the Russian police threatened him with prosecution under Article 212.1 of the Russian Federation Criminal Code.  And he claimed that this provision is a "notorious tool[] of government repression of dissent in Russia."  If that is true, then I agree with the majority that it could move Skripkov's case "from the sphere of private retaliation into the sphere of political repression."  *See* Maj. Op. at 13.  In other words: threatened prosecution under such a law could show that the officers were motivated, at least in part, by a desire to "suppress a challenge to the governing institution."  *See Zhang*, 426 F.3d at 548.  That conclusion—if reached—would necessitate a more nuanced mixed-motive analysis than the BIA and IJ conducted below.

We do not know, however, whether Skripkov's description of Article 212.1 is true. Neither the BIA nor the IJ addressed his threatened prosecution under this law below. I, thus, agree with the majority that we should GRANT Skripkov's petition and REMAND for the BIA and IJ to consider the strength and effect of this evidence in the first instance.