RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0221p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

BEKY IZAMAR MAZARIEGOS-RODAS; ENGLY YERAICY
MAZARIEGOS-RODAS,

                            *Petitioners*,

    *v.*

MERRICK B. GARLAND, Attorney General,

                            *Respondent*.

> No. 21-4064

On Petition for Review from the Board of Immigration Appeals.
Nos. A 208 174 902; A 208 174 903.

Argued: July 23, 2024

Decided and Filed: September 20, 2024

Before: GILMAN, GRIFFIN, and MATHIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Elinor Ruby Jordan, MICHIGAN IMMIGRANT RIGHTS CENTER, Lansing, Michigan, for Petitioners. John F. Stanton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Elinor Ruby Jordan, Polina Emilova Hristova, MICHIGAN IMMIGRANT RIGHTS CENTER, Lansing, Michigan, for Petitioners. John F. Stanton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

GILMAN, J., delivered the opinion of the court in which MATHIS, J., joined. GRIFFIN, J. (pp. 30–35), delivered a separate opinion concurring in part and dissenting in part.

––––––––––––––––––

**OPINION**

––––––––––––––––––

RONALD LEE GILMAN, Circuit Judge. Beky Izamar Mazariegos-Rodas and Engly Yeraicy Mazariegos-Rodas (collectively, the Petitioners) are two sisters who are natives and citizens of Guatemala. The Petitioners, who were left behind in Guatemala as young children after their parents entered the United States without inspection in 2009, fled to this country in 2015 after gang members threatened to maim and kill them. They also entered the United States without inspection, and the Department of Homeland Security (DHS) placed them into removal proceedings shortly thereafter.

Appearing before an immigration judge (IJ), the Petitioners applied for asylum and withholding of removal under the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1158, 1231(b)(3). The IJ denied the Petitioners' applications, the Board of Immigration Appeals (BIA) dismissed their appeal, and the Petitioners filed a timely petition for review with this court. They contend that (1) the IJ's bias against the Petitioners' mother violated their due-process rights, (2) the IJ erred in concluding that the Petitioners' proposed particular social group (PSG) of "Guatemalan female children without parental protection" is not cognizable, and (3) the BIA erred in concluding that there is no nexus between the harm that the Petitioners suffered and their other proposed PSG of "the Rodas family."

The Petitioners' arguments regarding due-process and the "Guatemalan female children without parental protection" PSG were not raised before the BIA and are thus unreviewable, but the BIA's no-nexus determination with regard to "the Rodas family" PSG is inconsistent with this court's precedents. We therefore **GRANT** the petition for review in part, **DISMISS** it in part, **VACATE** the BIA's denial of the Petitioners' application for asylum and withholding of removal, and **REMAND** for further proceedings consistent with this opinion.

# I.  BACKGROUND

After the Petitioners entered the United States in May 2015, DHS served them with Notices to Appear in July of that year, charging them with inadmissibility under the INA.  The Petitioners conceded removability as charged.   They subsequently applied for asylum and withholding of removal, asserting that they were entitled to relief based on their membership in two PSGs:  (1) "Guatemalan female children without parental protection," and (2) "the Rodas family."

## A.     Merits hearing

Both Beky (the older sister) and the Petitioners' mother Elodia testified before the IJ at a merits hearing.  The Petitioners also proffered written statements from Engly (the younger sister) and the Petitioners' father Ovidio, which the IJ accepted.

### 1.      *Beky's testimony*

Beky, who was 16 at the time of the hearing, testified through an interpreter about her experiences in Guatemala.  She explained what she knew about the harm that had befallen other girls in her family.  She was told that her distant cousin Michelle "was kidnapped by gangs."  In addition, Beky testified that an uncle had "tried to hurt" Marleni, a cousin with whom Beky had lived, but Beky "didn't know if [Marleni] was raped or not."

Beky then explained that, on multiple occasions when she was 12 or 13, gang members attempted to recruit her to sell drugs for them.  The first two times that they approached her, the gang members stated that another girl who was selling drugs "was doing very well" and that Beky "could make money" if she did the same.  When they targeted Beky for the third time, the gang members' tactics changed.  They forcibly separated Beky from her sister Engly and said that they knew why Beky did not want to sell drugs—because her parents were in the United States and that her family had money.  The gang members then insisted that Beky "had to" sell drugs, or else she and Engly "would turn up with [their] tongues cut out."

As a result of this experience, Beky did not attend school "for a long time," became scared of leaving the house, and "cried almost every day" after her aunt (with whom she lived)

did nothing to help her. Beky testified that she was scared to leave the house because she "felt that something could happen to [her]," and that gang members would "grab [her], and then [she] would not ever be back at home." Although there were "a lot of gang members" where she lived, Beky stated that she did not personally know anyone else who had been threatened or hurt. And on cross-examination, she reiterated that she did not know of any friends or classmates who had been threatened by the gang like she was.

The Petitioners' aunt eventually noticed that Beky "was not the same" after Beky's last encounter with the gang, so she asked if the Petitioners wanted to go to the United States to live with their parents. Based on their affirmative reply, the Petitioners and their aunt left Guatemala and entered the United States without inspection in 2015. When Beky was asked if there was anywhere else in Guatemala where she could have lived, she explained that she did not think so because her grandparents were "very old" and her aunt had "barely paid attention to [her]" after getting married.

### 2. *Elodia's testimony*

At the beginning of the hearing, the IJ had—upon learning that Elodia, the Petitioners' mother, would testify—remarked "Mom, who left her there? . . . I'll have to tell you; I'm going to have hard questions for her." Elodia nevertheless testified, also through an interpreter, after Beky finished.

Much of Elodia's testimony concerned her reasons for leaving Guatemala and the harm that she and her family had faced. She also discussed her fears of her brother-in-law (and the Petitioners' uncle) Eleazar. Elodia said that he was a gang member and that he had raped the Petitioners' cousin Marleni.

The IJ clearly expressed her disapproval of Elodia's conduct in abandoning Beky and Engly in Guatemala, and she also found Elodia's testimony to be untruthful. After Elodia finished testifying, the IJ remarked:

> But this woman made it all about herself. "Oh, it was more dangerous for me.
> Oh, I came because I was in danger." And she leaves these girls after she's
> already been told by this crazy uncle? Oh, my gosh. It just—I don't even know
> what to say. . . . I didn't believe [Elodia], and not just because she's a really bad

mom.  But there's a lot of reasons here.  And she was doing her darndest not to respond to questions that the government asked her.  She was able to answer all your questions, but as soon as [counsel for the government] started asking questions—that tells you a lot.  So—you can't come here and lie.

When the hearing continued at a later date, the IJ stated that she "was livid" and "hated [it]" when Elodia testified because Elodia was "so narcissistic and awful."  The IJ also remarked that the Petitioners "deserve better" and that she "feel[s] very bad for these girls, but that's not a basis for granting asylum."

### 3.      *Engly's and Ovidio's statements*

Engly and Ovidio did not testify, but submitted written statements.  The section of Engly's statement that is most relevant to this appeal reads as follows:

> The gangs stopped my sister on her way to school three times to ask her to join their groups.  On the third occasion, I was with my sister when they stopped us.  They told her that now they know why she didn't want to earn money, they thought that because our parents were living in the U.S.  They told Beky that she had seven or eight days, and then they would demand an answer from her.  They asked her again to join the gang and she said no.  At this point, they grabbed me and didn't want to let me go.  They told Beky that they wouldn't let me go until she agreed to join the gang.  They said that they would give her one last chance, or they would find the chance to kills [sic] us both and our families.  My sister said yes to them, just so that they would let go of me and we could get away.  Beky and I got away and after that we didn't go out or go to school anymore.

As for Ovidio's statement, the section that is most relevant concerns Eleazar, the Petitioners' uncle.  Ovidio stated his belief that Eleazar, who was romantically involved with one of the Petitioners' aunts, was a gang member because "Eleazar told me of a time he'd been arrested in Mexico[,] and I saw that he had three dots tattooed on his hand and he told me that they were gang."  In addition, Ovidio described his fears of Eleazar harming his daughters as follows:

> Since the girls came to the U.S.[,] I heard from [relatives living in Guatemala that] Eleazar [was] saying he was upset that [] Beky was in the Unites States.  I interpreted that to mean he had plans to harm her and was upset he didn't get to bring those plans to completion.  I also learned that he hoped to kidnap the girls and hold them for ransom.  I am afraid that if Beky and Engly return, Eleazar is capable of harming them or doing anything he wishes to them[,] and I think the

police will not do anything to protect them. I know Eleazar has harmed many girls and also could kidnap them because their parents, myself and Elodia, are in the U.S.

The Petitioners also submitted documentary evidence regarding country conditions in Guatemala, including but not limited to the country's treatment of girls in general and children without parental protection in particular.

**B. Procedural history**

The IJ refused to credit Elodia's testimony, but credited Beky's testimony and accepted the proffered statements by Engly and Ovidio. She nevertheless denied the Petitioners' claims for asylum and withholding of removal on the following grounds: (1) the Petitioners did not suffer harm that rose to the level of past persecution, (2) the proposed PSG comprised of "Guatemalan female children without parental protection" was not cognizable because it was not "immutable" or sufficiently "particular," (3) although family membership constitutes a cognizable PSG, the Petitioners failed to establish a nexus between the harm they suffered and either of their proposed PSGs, and (4) the Petitioners had not established that any well-founded fear of future persecution would be on account of their membership in a cognizable PSG.

In concluding that there was no nexus, the IJ faulted the Petitioners for failing to "show that the [gang members] had the intent to overcome [the Petitioners'] temporary lack of supervision." She similarly concluded that the Petitioners "ha[d] not shown that Eleazar targeted them based on their family membership." But other than stating that "simply because a member of a family has been harmed in the past does not mean that they . . . were targeted based on that membership," the IJ provided no explanation as to what she believed Eleazar's motives to be. The IJ noted only that "a pedophile's presence in one's family creates an opportunity for abuse; yet no nexus forms without intent to overcome a protected status."

Nowhere in the IJ's opinion did she address whether the Guatemalan government would be unable or unwilling to control the Petitioners' persecutors. She instead concluded that the Petitioners had not established their eligibility for protection under the Convention Against Torture. But given that the Petitioners indicated on their applications that they were not afraid of

being subject to torture in Guatemala or any other country, they do not appear to be seeking that form of relief.

The Petitioners appealed the IJ's decision to the BIA, and the BIA affirmed. It held that the IJ did not err in finding Elodia not credible. Contrary to the IJ's no-persecution finding, however, the BIA "assum[ed], without deciding, that the harm rose to the level of persecution."

But the BIA agreed with the IJ "that the gang members were motivated by financial gain rather than animus toward the [Petitioners'] family." It cited to the IJ's finding that "the gang members never identified the [Petitioners] by name or said anything to indicate that they knew who they were or that they belonged to the [Rodas] family." And it stated that although "the gang members mentioned that the [Petitioners'] parents were in the United States, . . . that does not establish that the gang members had the intent to overcome the [Petitioners'] temporary lack of supervision." As for the Petitioners' uncle Eleazar, the BIA stated that "while [Eleazar] previously harmed [the Petitioners'] cousin, this alone is insufficient to establish that he will target [the Petitioners] based on their familial relationship."

The BIA then affirmed the IJ's conclusion that "Guatemalan female children without parental protection" is not a cognizable PSG. It "point[ed] out that the [Petitioners] do not meaningfully address the Immigration Judge's findings that the group is not particular and overbroad on appeal." And it concluded that the Petitioners' assertion that a different IJ had found a similar group to be cognizable was unpersuasive because "[t]he inquiry of whether a proposed particular social group is cognizable is conducted on a case-by-case basis."

Finally, the BIA acknowledged that the nexus standard for withholding of removal is easier to satisfy than for asylum, but it concluded that the Petitioners had not satisfied that lower requirement either. The BIA again relied on the fact that the gang members did not refer to the Petitioners by name, and that "it was unclear [that the gang members] even knew the [Petitioners] belonged to the [Rodas] family." It also concluded that there was no nexus between the Petitioners' fear of Eleazar and a protected ground because Eleazar had done no more than "previously harm[] their cousin and became 'upset' that the [Petitioners] left Guatemala." This timely appeal followed.

## II. ANALYSIS

### A. Standard of review

This court has jurisdiction under 8 U.S.C. § 1252 to review the BIA's final orders of removal. *Umaña-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013). Where the BIA "issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). But where the BIA's separate opinion adopts an IJ's reasoning, "this Court also reviews the [IJ's] decision." *Id.*

"Claims of due-process violations in removal proceedings are reviewed de novo." *Sebastian-Sebastian v. Garland*, 87 F.4th 838, 847 (6th Cir. 2023). This court also reviews de novo the BIA's legal determinations, such as whether an applicant's proposed PSGs are cognizable under the INA. *Sanchez-Robles v. Lynch*, 808 F.3d 688, 692 (6th Cir. 2015).

In contrast, "[a] nexus determination is a finding of fact and is thus reviewed under the substantial-evidence standard." *Sebastian-Sebastian*, 87 F.4th at 847 (citing *Turcios-Flores v. Garland*, 67 F.4th 347, 357 (6th Cir. 2023). Pursuant to that standard, this court will "uphold a [BIA] determination as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Juan Antonio v. Barr*, 959 F.3d 778, 788 (6th Cir. 2020) (internal quotation marks omitted). But "[a] determination based on flawed reasoning . . . will not satisfy the substantial evidence standard." *Diaz-Zanatta v. Holder*, 558 F.3d 450, 454 (6th Cir. 2009) (quoting *Balachova v. Mukasey*, 547 F.3d 374, 380 (2d Cir. 2008)). And where the BIA "ignored declarations and other record evidence" connecting the harm an applicant suffered to a protected ground, its nexus finding is not supported by substantial evidence. *Juan-Pedro v. Sessions*, 740 F. App'x 467, 470, 474 (6th Cir. 2018) (vacating the BIA's no-nexus finding). Finally, if an IJ finds the witnesses credible, this court "accept[s] their factual statements as true." *Mandebvu v. Holder*, 755 F.3d 417, 424 (6th Cir. 2014).

**B.          Due-process claim**

The Petitioners first contend that the IJ's antipathy towards their mother during their merits hearing deprived them of a fair hearing and violated their due-process rights. For its part, the government does not address this argument on the merits, but instead contends that we cannot consider the due-process claim because it is "unexhausted." The government's argument is based on the Petitioners' failure to raise their due-process claim before the BIA.

We agree with the government. Courts "may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). This exhaustion requirement is not jurisdictional, but instead a claim-processing rule subject to either waiver or forfeiture. *Santos-Zacaria v. Garland*, 598 U.S. 411, 417–23 (2023). Claim-processing rules, however, "may be mandatory in the sense that a court must enforce the rule if a party properly raises it." *Fort Bend County v. Davis*, 587 U.S. 541, 549 (2019) (cleaned up).

The Petitioners argue that, to the extent that they failed to exhaust this claim, any such failure should be excused because, as this court held in *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006), a "due process challenge generally does not require exhaustion." This exception to the exhaustion requirement is based on the principle that "the BIA lacks authority to review constitutional challenges." *Id.* But *Sterkaj* also held that an applicant "must raise correctable procedural errors to the BIA," *id.*, and this court has determined that due-process claims "related to agency bias against the petitioner fall within the category of correctable procedural errors and are thus subject to the statutory exhaustion requirement," *Tomaszczuk v. Whitaker*, 909 F.3d 159, 167 (6th Cir. 2019).

In the alternative, the Petitioners argue that they in fact exhausted this claim when they challenged the IJ's finding that their mother was not credible. But, as the government correctly points out, the Petitioners' brief before the BIA did not raise a due-process claim. And although the Petitioners mentioned that the IJ "expressed a dislike of the personal decisions and personality traits of [the Petitioners'] mother," their argument focused almost entirely on explaining alleged inconsistencies in their mother's testimony relating to the relatives with whom

the Petitioners had lived in Guatemala. Such a passing reference to the IJ's bias, without any citation to relevant caselaw or even a mention of the words "due process," is not sufficient to constitute "raising a correctable procedural error to the BIA." *Sterkaj*, 439 F.3d at 279 (cleaned up). This claim is therefore unexhausted, and because the government has raised the exhaustion issue, we are precluded from deciding it on the merits.

## C. The "Guatemalan female children without parental protection" PSG

The Petitioners next contend that the BIA erred in concluding that their proposed PSG comprised of "Guatemalan female children without parental protection" is not cognizable. For its part, the government asserts that this argument fails because the Petitioners did not "meaningfully challenge the [IJ's] dispositive finding that the proposed group lacked particularity." We again agree with the government.

This court has deferred to the BIA's requirement that a PSG be (1) "immutable," (2) "particular," and (3) "socially distinct" (formerly "socially visible"). *Menijar v. Lynch*, 812 F.3d 491, 498 (6th Cir. 2015). A group is "immutable" where its members share a characteristic that they "either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Umaña-Ramos v. Holder*, 724 F.3d 667, 671 (6th Cir. 2013) (citation and internal quotation marks omitted). "Particularity refers to whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." *Id.* (cleaned up). And "social distinction" (or "social visibility") "requires that the shared characteristic of the group should generally be recognizable by others in the community." *Id.* (cleaned up). An applicant's proposed PSG must satisfy all three of these requirements in order to constitute a protected ground for purposes of asylum and withholding of removal under the INA. *Menijar*, 812 F.3d at 498.

Here, the IJ believed that the "Guatemalan female children without parental protection" PSG was not immutable or particular, but "has some social visibility." The BIA affirmed the IJ's conclusion, stating that the Petitioners "d[id] not meaningfully address the Immigration Judge's findings that the group is not particular and [is] overbroad. . . ."

On appeal, the Petitioners assert that even though much of their brief before the BIA focused on immutability, they also sufficiently challenged the IJ's finding that their "Guatemalan female children without parental protection" PSG was not particular. They primarily rely on a sentence in their BIA brief that stated: "[A]s noted in [the Petitioners'] Brief 24, an IJ in Los Angeles found that 'young female members of a vulnerable family that cannot protect them' was a sufficient particular social group to establish a case for asylum."

True enough, this court has recognized that where the agency has previously reached the "opposite conclusion for a similarly situated applicant," the BIA errs if it "fail[s] to adequately distinguish" its denial of an applicant's claim for relief from removal. *Kada v. Barr*, 946 F.3d 960, 967 (6th Cir. 2020). The BIA should therefore refrain from cursorily disregarding a decision submitted by an applicant, even if that decision is not binding, simply because the PSG determination is conducted on a case-by-case basis.

But, as the government points out, the IJ's opinion upon which the Petitioners rely does not appear to involve a "similarly situated" applicant or stand for the proposition that they assert. That opinion instead granted relief based on "the particular social group of [that applicant's] family" and did not address the cognizability of a group such as "young members"—whether male or female—"of a vulnerable family that cannot protect them." The Petitioners did not address in their BIA brief how the IJ's decision supported their position, nor did they mention the word "particularity" or explain how their proposed PSG would be seen as a "discrete class of persons" in Guatemala. *See Umaña-Ramos*, 724 F.3d at 671. Such a bare-bones reference to seemingly inapposite authority, without at least some attempt at explanation, does not suffice to have raised an issue before the BIA. *See Singh v. Rosen*, 984 F.3d 1142, 1155 (6th Cir. 2021) (noting that the relevant "procedural rules require a party to identify every legal or factual issue that the party seeks to raise with the [BIA] in the notice of appeal of the immigration judge's decision" (citing 8 C.F.R. § 1003.3(b))).

Because the Petitioners did not properly raise this issue before the BIA, they have failed to exhaust their challenge to the IJ's finding that the "Guatemalan female children without parental protection" PSG is insufficiently particular. *See* 8 U.S.C. § 1252(d)(1). And where, as

here, the government has raised the exhaustion requirement, we must enforce it. *See* Part IV.B, *supra*. We are therefore precluded from addressing this issue on the merits.

**D.      Nexus to the Petitioners' family**

The Petitioners also sought asylum and withholding of removal on the basis of their status as "members of the Rodas family." Although acknowledging that "family is a well-established particular social group," the IJ concluded that there was no nexus between the harm that the Petitioners suffered and their family membership. The BIA agreed with the IJ, stating that it "discern[ed] no clear error in the [IJ's] finding regarding the motive of the [Petitioners'] alleged persecutors." On appeal, the Petitioners contend that the BIA's analysis is inconsistent with this court's precedents. We agree.

### 1.      *Asylum*

An applicant must demonstrate that a protected ground—such as her membership in a PSG—is "at least one central reason" for her persecution in order to qualify for asylum. 8 U.S.C. § 1158(b)(1)(B)(i). As one of our sister circuits has noted, "[i]t is unrealistic to expect that a gang would neatly explain . . . all the legally significant reasons it is targeting someone." *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 248 (4th Cir. 2017); *see also Hermosillo v. Garland*, 80 F.4th 1127, 1132 (9th Cir. 2023) ("[P]ersecutors are hardly likely to provide their victims with affidavits." (quoting *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir. 1984))).

Both this court and the BIA have recognized that persecutors can be motivated "both by a protected ground and other, nonprotected grounds, such as personal pecuniary gain." *Skripkov v. Barr*, 966 F.3d 480, 487 (6th Cir. 2020); *In re S-P-*, 21 I.&N. Dec. 486, 489 (B.I.A. 1996) ("Persecutors may have differing motives for engaging in acts of persecution, some tied to reasons protected under the [INA] and others not. . . . An asylum applicant is not obliged to show conclusively why persecution has occurred or may occur."). Applicants in such "mixed-motives" cases "need only show that [their persecutor] was motivated to [harm them], at least in part, on account of an enumerated ground." *Bi Xia Qu v. Holder*, 618 F.3d 602, 608 (6th Cir. 2010); *see also Stserba v. Holder*, 646 F.3d 964, 972–73 (6th Cir. 2011) ("[I]n a case of

mixed motives, the petitioner is eligible for asylum . . . so long as *one* of the factors motivating the persecution is a protected ground under the INA.") (cleaned up) (emphasis in original).

The government argues that, pursuant to this court's precedents and the BIA's recent decision in *Matter of M-R-M-S-*, 28 I.&N. Dec. 757 (B.I.A. 2023), a mixed-motives analysis is warranted only if an applicant first proves that her persecutors were motived by animus towards a protected ground. We find that argument unpersuasive for the reasons set forth below.

### a.       *This court's precedents*

In December 2023, this court issued *Sebastian-Sebastian v. Garland*, 87 F.4th 838 (6th Cir. 2023). The *Sebastian-Sebastian* court noted that, "to determine if a central reason for the applicant's persecution is a protected ground," both the BIA and this court must "examin[e] the nature of the conduct on which an application for asylum is based" and "look[] to the overall context of the applicant's situation." *Id.* at 847 (alterations in original) (quoting *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005) (per curiam)). As a result, the BIA "erroneously stopped short" when it "found one motive and prematurely ended its analysis there, ignoring the fact that a 'conclusion that a cause of persecution is [personal] does not necessarily imply that there cannot exist other causes of persecution.'" *Id.* at 848 (quoting *Osorio v. INS*, 18 F.3d 1017, 1028 (2d Cir. 1994)).

The correct approach is instead to consider "whether the [persecutor's] motives were 'inextricably intertwined' with [the applicant's] particular social groups." *Id.* at 850. And as this court has previously explained, where a persecutor's views of a PSG "underlay all of his actions," his motivations are "inextricably intertwined" with that PSG because there is no way to "fairly distinguish" the persecutor's personal motives from his perceptions of the group. *Al-Ghorbani v. Holder*, 585 F.3d 980, 998 (6th Cir. 2009), *superseded on other grounds by statute*, 8 U.S.C. § 1252(b)(3)(B). The BIA therefore cannot simply attribute a persecutor's actions to unprotected grounds, such as personal animus or financial gain, and overlook evidence suggesting that the persecutor "harmed [the applicant], at least in central part, *because* [of] . . . a characteristic that is a core aspect of [the applicant's] proposed social groups." *Sebastian-Sebastian*, 87 F.4th at 849 (emphasis in original).

Here, neither the IJ nor the BIA addressed whether the persecutors might have had mixed motives for targeting the Petitioners. The BIA instead relied on this court's decision in *Cruz-Guzman v. Barr*, 920 F.3d 1033 (6th Cir. 2019), to conclude that an applicant seeking asylum on the basis of a family-based PSG must provide "evidence of animus towards [the] family itself." And when asked about *Sebastian-Sebastian* at oral argument, counsel for the government similarly contended that a remand is unnecessary because the Petitioners' persecutors had not demonstrated any animus toward the Rodas family.

At first glance, this assertion appears reasonable. The *Cruz-Guzman* court upheld the BIA's no-nexus finding because the applicant's proffered evidence "[did] not show that [the persecutor's] actions were motivated by a particular animus toward the [applicant's] family itself, as opposed to an ordinary criminal desire for financial gain." 920 F.3d at 1037. It also cited the BIA's statement in *Matter of L-E-A-*, 27 I.&N. Dec. 40, 45 (B.I.A. 2017), explaining that "[t]he fact that a persecutor targets a family member simply as a means to an end is not, by itself, sufficient to establish a claim, especially if the end is not connected to another protected ground." *Cruz-Guzman*, 920 F.3d at 1038.

But *Cruz-Guzman* does not exist in a vacuum. Rather, we must consider it in the context of this court's other precedential opinions on this issue. And this court has, in decisions predating *Cruz-Guzman*, recognized that a mixed-motives analysis might be warranted even where a persecutor (1) has not demonstrated any animus or hostility towards the applicant's specific PSG, or (2) targets an applicant as a means to accomplishing some other end.

In *Bi Xia Qu v. Holder*, 618 F.3d 602 (6th Cir. 2010), for example, the persecutor—"a 'big thug' in the [Chinese] underground world [who] had powerful connections in the government"—kidnapped, physically assaulted, and attempted to rape the applicant after the applicant's father was unable to pay back a loan. *Id.* at 604–05. The applicant claimed that she was persecuted on account of "her membership in the group of women in China who have been subjected to forced marriage and involuntary servitude," and this court agreed. *Id.* at 608.

Nothing in *Bi Xia Qu* suggested that the persecutor held any particular animus or hatred towards "women in China who have been subjected to forced marriage and involuntary

servitude" as a group. *Id.* Nor was there any doubt that the persecutor kidnapped the applicant as a means of achieving a goal—obtaining repayment of a loan—that had no connection to the applicant's status as a woman who could be forced into marriage. *Id.* But this court nevertheless recognized that, because the persecutor "targeted [the applicant] both to secure the repayment of his loan from [her] father *and* because she was a woman whom he could force into marriage in a place where forced marriages are accepted," this situation "represent[ed] a mixed motive case." *Id.* (emphasis in original).

Similarly, *Al-Ghorbani v. Holder*, 585 F.3d 980, 998 (6th Cir. 2009), the persecutor's goal in persecuting Abdulmunaem (one of the applicants) was to get him to "giv[e] up his marriage to" the persecutor's daughter. After Abdulmunaem fled, the persecutor then persecuted Salah (the other applicant and Abdulmunaem's brother) not as an end in itself, but instead to learn where Abdulmunaem had gone. *Id.* This court concluded, however, that Abdulmunaem's and Salah's "social class and . . . opposition to Yemeni paternalistic rights" were still central reasons for their persecution—even though the persecutor's ultimate goal was to force his daughter to marry her first cousin—because "the [persecutor's] personal motives cannot be unraveled from his motives based on" those protected grounds. *Id.* at 997–98.

The Jordanian government in *Kamar v. Sessions*, 875 F.3d 811 (6th Cir. 2017), also lacked any animus towards the applicant's PSG comprised of "women who, in accordance with social and religious norms in Jordan, are accused of being immoral criminals." *Id.* at 818. Rather, because women in this group were often targeted for "honor killings" by their male relatives, the government forced those women into "protective custody" as a means of preventing such killings. *Id.* at 818–19. But this supposedly "protective" custody was in fact "involuntary, and often involve[d] extended incarceration in jail." *Id.* at 819 (citation omitted). This court recognized that such involuntary incarceration, even if arising out of a desire to protect these women rather than any animus towards them, was "akin to persecuting the victim[,] as she must choose between death and an indefinite prison term" because of her status as a member of that PSG. *Id.* at 819–20 (internal citation and quotation marks omitted); *see also Juan-Pedro v. Sessions*, 740 F. App'x 467, 472 (6th Cir. 2018) (holding that even though a gang was "motivated by their criminal and financial interests" and had not expressed any animus towards

Mayans, the applicant's Mayan ethnicity was still "one central reason" for her persecution where the gang perceived her as "an attractive target" because of her ethnicity).

In contrast to the BIA's focus on "animus" in cases involving a family-based PSG, the INA states only that the persecution must be "*on account of* race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42) (emphasis added). And, as the Fourth Circuit has correctly noted, "nothing in the text of the INA . . . suggests that the phrase 'on account of' means one thing in family ties cases and another in [other] cases." *Chicas-Machado v. Garland*, 73 F.4th 261, 267 n.3 (4th Cir. 2023). We recognize that two of the most straightforward ways for an applicant to satisfy the nexus requirement are to show that her persecutor either (1) harbored animus towards her protected characteristic, or (2) sought to harm individuals with that characteristic as an end in itself. But neither common sense nor the plain text of the INA indicates that those are the *only* possible ways to establish that persecution is "on account of" a PSG or any other protected ground. *See* 8 U.S.C. § 1101(a)(42).

Consider a hypothetical sex trafficker who exclusively forces blonde, Caucasian women to join his prostitution ring because he believes that having an all-blonde, all-Caucasian group of escorts will set him apart from his competitors and benefit him financially. This trafficker is not targeting these women because of animus towards Caucasian women as a group—if anything, he perceives Caucasian women in a positive light because of their appeal to his clientele. And regardless of the trafficker's views of Caucasian women as a group, a central reason that he is targeting these women (rather than women of other races) is because he sees them as a means of achieving greater financial success.

If "on account of" were to mean only "animus" or "not a means to an end," then we would be obliged to conclude that these women were not forced into prostitution "on account of" their race—even though the trafficker targeted them specifically because they were Caucasian and would have had no interest in them if they were of a different race. We see nothing in either the text of the INA or our decisions in *Bi Xia Qu*, *Kamar*, and *Al-Ghorbani* that would compel such a counterintuitive conclusion. *See also Matter of Kasinga*, 21 I.&N. Dec. 357, 367 (B.I.A.

1996) (noting that compulsory female genital mutilation can satisfy the nexus requirement "even if done with 'subjective benign intent'").

We also note that *Cruz-Guzman* did not mention a mixed-motives analysis or discuss *Bi Xia Qu*, *Al-Ghorbani*, or *Kamar*, so we do not believe that it intended to overrule those cases to hold that "animus" and "not a means to an end" are the only possible ways to satisfy the nexus requirement. *See Cooper v. MRM Inv. Co.*, 367 F.3d 493, 507 (6th Cir. 2004) ("Implied overrulings . . . are disfavored."); *see also United States v. Meek*, 32 F.4th 576, 582 (6th Cir. 2022) ("One panel of this Court, in other words, cannot overrule another, let alone two others."). And because *Cruz-Guzman* can be interpreted more narrowly than the government contends, we do not believe that it necessarily conflicts with our earlier precedents. *See Cooper*, 367 F.3d at 507 ("When possible, we will distinguish seemingly inconsistent decisions rather than find an overruling by implication.").

*Cruz-Guzman*'s no-nexus determination, although phrased broadly, was based on the panel's agreement with the BIA that "the more likely explanation for persecution was basic criminality as opposed to membership in a social group or other protected status." 920 F.3d at 1037. Determining what is "the more likely explanation for persecution" in any given case is necessarily fact-intensive and, for the reasons that we will address in our discussion of the facts relating to the gang members, *see* Part II.D.1.c.i, *infra*, the facts of *Cruz-Guzman* are materially different from those of this case.

The government also cites *Turcios-Flores v. Garland*, 67 F.4th 347 (6th Cir. 2023), for the proposition that this court has denied family-based asylum claims "due to lack of evidence [that the] gang possessed animus against [the] applicant's family." But the *Turcios-Flores* court was summarizing *the BIA's decision* when it mentioned animus. 67 F.4th at 357. The court itself did not base its affirmance on the lack of "any particular animus," but instead stated that "the record included no indication that [the applicant's] connection to her husband's family *singled her out* for gang-driven persecution." *Id.* (emphasis added)

There is no basis, however, for us to assume that animus is the only reason for someone to be "singled out." Rather, the term "to single out" is defined as "to treat or speak about

[someone] in a way that is different from the way one treats or speaks about others." Merriam-Webster Online, https://www.merriam-webster.com/dictionary/single%20out# (last visited Sept. 19, 2024). An applicant can thus be "singled out" for persecution on account of a protected ground where, as the Fourth Circuit has noted, that ground was "at least one central reason why she, as opposed to another person, was targeted for [persecution]." *Alvarez Lagos v. Barr*, 927 F.3d 236, 250 (4th Cir. 2019). And, as is evident from the sex-trafficker hypothetical discussed above, a persecutor can "single out" or target individuals belonging to a certain group (such as Caucasian women) for persecution even if the persecutor has no animosity towards the group. Accordingly, we conclude that our precedents do not require an asylum applicant to prove animus in order to satisfy the nexus requirement.

### b. Matter of M-R-M-S-

The BIA's recent decision in *Matter of M-R-M-S-*, 28 I.&N. Dec. 757 (B.I.A. 2023), does not change our analysis. That decision involved a criminal cartel that forced the applicants off of land belonging to the applicants because the cartel wanted the land for its own purposes. *Id.* at 757. The cartel also killed the lead applicant's grandson for unknown reasons, and despite the applicants' speculation that the killing was related to the cartel's efforts to obtain their land, the BIA noted that the cartel also forced other families off of land in the same area. *Id.* at 757–58.

Although nothing in the facts above suggested any connection between the cartel's actions and the applicants' family membership, the BIA went on to state that "[t]o be successful in an asylum claim based on family membership, an applicant must demonstrate that the persecutor's motive for the harm is a desire to overcome the protected characteristic of the family or otherwise based on animus against the family." *Id.* at 760. It also concluded that "[i]f a persecutor is targeting members of a certain family as a means of achieving some other ultimate goal unrelated to the protected ground, family membership is incidental or subordinate to that other ultimate goal and therefore not one central reason for the harm." *Id.* at 762.

As a preliminary matter, these statements are dicta because they were "unnecessary to the decision in the case" where the persecutors were motivated solely by a desire to obtain land. *See Richmond Health Facilities-Kenwood*, *LP v. Nichols*, 811 F.3d 192, 201 n.8 (6th Cir. 2016)

(quoting *Obiter Dictum*, Black's Law Dictionary (10th ed. 2014)).  Moreover, an overly restrictive nexus standard contradicts the BIA's own pronouncements that "[i]n adjudicating mixed motive cases, it is important to keep in mind the fundamental humanitarian concerns of asylum," and that "[s]uch an approach is designed to afford a generous standard for protection in cases of doubt." *See In re S-P-*, 21 I.&N. Dec. 486, 492 (B.I.A. 1996).

Such an unnecessarily broad holding is also inconsistent with *Bi Xia Qu*, *Al-Ghorbani*, and *Kamar* for the reasons previously discussed.  *See* Part II.D.1.a, *supra*.  Our sister circuits have likewise recognized that a protected ground cannot be dismissed as an incidental or tangential reason for the persecution simply because a persecutor might have pecuniary goals. *See, e.g.*, *Perez-Sanchez v. U.S. Att'y Gen.*, 935 F.3d 1148, 1158 (11th Cir. 2019) (determining that an applicant's familial relationship with his father-in-law was "one central reason" for his persecution when gang members extorted him in order to recoup the debts that his father-in-law owed them); *Hernandez-Cartagena v. Barr*, 977 F.3d 316, 322–23 (4th Cir. 2020) (holding that an applicant was targeted on account of her family membership when "the threats and violence against [the applicant and her family members] were designed to get *her parents* to pay up") (emphasis in original); *Aldana-Ramos v. Holder*, 757 F.3d 9, 19 (1st Cir. 2014) ("There may be scenarios in which a wealthy family, targeted in part for its wealth, may still be the victims of persecution as a family."); *Manzano v. Garland*, 104 F.4th 1202, 1207 (9th Cir. 2024) ("[A] persecutor who extorts someone could in theory be motivated not just by the prospect of obtaining money[,] but also by a petitioner's protected characteristic.") (first alteration in original) (citation and internal quotation marks omitted).

Similarly, *M-R-M-S-*'s requirement that the persecutor have "a desire to overcome the protected characteristic," 28 I.&N. at 760, is undercut by *Sebastian-Sebastian v. Garland*, 87 F.4th 838 (6th Cir. 2023).  *Sebastian-Sebastian* involved a Guatemalan woman of Chuj ethnicity, where this court instructed the BIA to apply a mixed-motives analysis even though the applicant's membership in the groups "Guatemalan Chuj [w]omen in domestic relationships who are unable to leave" and "Guatemalan Chuj [w]omen who are viewed as property by virtue of their positions within a domestic relationship" was not some obstacle that her mother-in-law had to "overcome" in order to persecute her. *Id.* at 848–49.  To the contrary, the applicant's status as

one of those women made her particularly vulnerable to her mother-in-law's abuse because "cultural expectations dictated that a Guatemalan Chuj woman in her position . . . must stay with her in-laws and have nowhere else to go." *Id.* at 849. This court thus recognized that the applicant's "mother-in-law harmed her, at least in central part, *because* [the applicant] could not leave, a characteristic that is a core aspect of two of her proposed social groups—Guatemalan Chuj women in domestic relationships who are unable to leave and who are viewed as property by virtue of their relationship." *Id.* (emphasis in original).

True enough, the Supreme Court in *National Cable & Telecommunications Assn. v. Brand X Internet Services* (*Brand X*), 545 U.S. 967, 962 (2005), held that an agency like the BIA could disagree with (and thus decline to follow) a circuit's precedents on a question of statutory interpretation where the statute at issue was ambiguous. And the BIA in *M-R-M-S-* expressly disagreed with a decision by the Fourth Circuit that had held that an applicant's family membership was a central reason for her persecution when that family membership was "why she, and not another person, was targeted" as part of a gang's efforts to recruit her son. 28 I.&N. at 761–62 (citing *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 947, 949–50 (4th Cir. 2015)). The BIA acknowledged that a protected ground is a central reason for the persecution where that ground "is intertwined with or underlies the dispute," but then cited *Cruz-Guzman v. Barr*, 920 F.3d 1033 (6th Cir. 2019), to support its conclusion that family status is typically "at most, incidental or tangential to more commonplace goals," such as financial gain or criminal activity. *Id.* at 760.

Although *M-R-M-S-* does not cite either *Bi Xia Qu* or *Al-Ghorbani*, the application of *M-R-M-S-* to the case before us would effectively overrule those cases' instruction to consider the possibility of mixed motives even when a persecutor has financial or criminal goals. The problem for the BIA, however, is that *Brand X*, which provided the authority for the BIA's decision in *M-R-M-S-*, stated in no uncertain terms that the "principle" of agencies effectively overruling federal courts of appeals "follows from *Chevron [U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)] itself." 545 U.S. at 982. And now that "*Chevron* is overruled," *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024), the BIA has no legal authority to disregard precedential decisions of this court, *see id.* at 2266 ("[A]gencies have

no special competence in resolving statutory ambiguities.   Courts do."); *see also id.* at 2289 (Gorsuch, J., concurring) (criticizing the BIA's invocation of *Chevron* "to overrule a judicial precedent on which many immigrants had relied").

For all of these reasons, we reject the government's bright-line rule that a mixed-motives analysis is appropriate only where a persecutor (1) demonstrates an animus towards a protected ground, (2) expresses a desire to "overcome" that ground, or (3) disclaims any intention of targeting the applicant as a means of accomplishing some other end.  We instead conclude that, pursuant to this court's precedents, the BIA must review the record as a whole to determine if a persecutor's motives are "inextricably intertwined" with an applicant's PSGs. *Sebastian-Sebastian*, 87 F.4th at 850 (citing *Al-Ghorbani*, 585 F.3d at 998).

### c.		*Application to this case*

We acknowledge that not every persecutor's motives will be "inextricably intertwined" with a protected ground. *Id.*  If the Petitioners' persecutors had said only that "we know that you go to school A" or "we know that you live in neighborhood B"—or if they had said nothing other than "we will cut your tongue out if you do not sell drugs for us" or "I want to kidnap you"—then a mixed-motives analysis would be unnecessary unless there were other evidence connecting those threats to the Petitioners' family membership.

That, however, is not what happened here.  Rather, both the gang members and the Petitioners' uncle Eleazar expressly connected their actions to the Petitioners' family status.  We will therefore address each persecutor in turn.

### i.		*Gang members*

Immediately before threatening to maim and kill the Petitioners, the gang members expressly stated that they (1) knew that the Petitioners' parents were in the United States, and (2) believed that Beky had refused to sell drugs because she "had money" from her U.S.-based parents.  This was a notable escalation from the gang members' previous attempts to entice Beky into selling drugs, during which they said only that she "could make money."  It was also the first time that the gang members had mentioned the Petitioners' family situation.

The BIA nevertheless concluded that "the gang members were motivated by financial gain rather than an animus toward [the Petitioners'] family" because "the gang members never identified the [Petitioners] by name or said anything to indicate that they knew who they were or that they belonged to the Rodas[] family." There are several problems with the BIA's analysis.

First, the BIA's determination that the sole reason for the persecution was "financial gain" is undercut by the fact that the gang members never attempted to extort or demand money directly from the Petitioners. Financial gain could certainly have been one reason—and perhaps even a "central reason"—why the gang was targeting the Petitioners. But just as the simultaneous existence of a personal dispute does not eliminate a nexus between the harm suffered and a protected ground, *see Bi Xia Qu v. Holder*, 618 F.3d 602, 608 (6th Cir. 2010), neither does the existence of a pecuniary motive. And the BIA never explains why, if the gang members' only possible reason for threatening the Petitioners was financial gain, they would entrust Beky with drugs to sell rather than simply demand money from her, especially when they believed that "[she] had money" because her parents were in the United States. The BIA instead "found one motive"—financial gain—"and prematurely ended its analysis there" without ever addressing whether that motive was "inextricably intertwined" with a protected ground, or whether there were other reasons for the persecution. *See Sebastian-Sebastian*, 87 F.4th at 848.

Even before *Sebastian-Sebastian*, this court had warned the BIA against assuming that a persecutor's motives are solely financial without conducting a mixed-motives analysis. The persecutors in *Skripkov v. Barr*, 966 F.3d 480 (6th Cir. 2020), "were upset with [the applicant] because he refused to go along with their corruption scheme and reported them, which caused them to lose money." *Id.* at 486. Based on these facts, the IJ found that the persecutors were motivated solely by pecuniary reasons. *Id.* This court, however, held that such a conclusion "fail[ed] to take into account the obvious connection between the officers' corrupt scheme and [the applicant's] anticorruption activities." *Id.* This "obvious connection" presented "a classic mixed-motive case where a petitioner's alleged persecutors are motivated both by a protected ground and other, nonprotected grounds, such as personal pecuniary gain." *Id.* at 486–87.

And whereas the persecutors in *Skripkov* did not specifically reference the applicant's political opinions or otherwise indicate that they saw him as a political activist, *see generally id.*,

the connection to a protected ground was explicit here. The gang members themselves expressly premised their threats on the assumption that Beky was refusing to sell drugs for the gang because she, as a member of the Rodas family, was receiving money from her U.S.-based parents. Thus, just as the corrupt officers in *Skripkov* "lost money precisely because of [the applicant's] political opinion against corruption," the gang members believed that they had been unable to recruit Beky (and thus increase their drug-selling revenue) "precisely because of" Beky's familial relationship with her parents. *See id.*

None of the cases cited by the government involve the unusual case of a persecutor expressly discussing a protected ground immediately before engaging in persecution. At best, *Cruz-Guzman v. Barr*, 920 F.3d 1033 (6th Cir. 2019), involved members of a gang who, while attacking the applicant's mother for failing to meet their extortionary demands, threatened to rape her daughter (the applicant's sister) and indicated that they knew the applicant was in the United States. *Id.* at 1037. But in the context of extorting the applicant's mother, this mention of the applicant living in the United States was more likely an explanation for why the gang believed that the mother had the money to pay. And given that the gang members did not appear to follow through on their threats to rape the applicant's sister after the mother fled, we cannot say that a passing reference to an applicant during the persecution of a relative is equivalent to what the Petitioners in this case experienced.

In contrast, *Perez Vasquez v. Garland*, 4 F.4th 213 (4th Cir. 2021), is squarely on point. That case involved an applicant who "credibly testified that when the gang first contacted her to demand extortion payments, they told her that they knew she traveled . . . every month to withdraw money that her husband sent to her from the United States." *Id.* at 225. The Fourth Circuit explained that, in such a scenario, "even if the gang was motivated by monetary gain, that reason was inevitably intertwined with Petitioner's familial relationship to her husband" because "the gang . . . threatened her and her daughter with death, while explicitly stating that they knew [that] she received money every month from her husband in the United States." *Id.* at 225–26.

The gang members in this case similarly threatened the Petitioners with maiming and death while explicitly stating that they knew that the Petitioners' parents were in the United States and allegedly sending them money. Their decision to escalate their efforts into death

threats—rather than simply continue to entice Beky—therefore appears to be motivated by their perception of her as both (1) less susceptible to financial incentives because her parents were in the United States, and (2) more vulnerable to threats of violence because her parents were not in Guatemala. Given this "overall context of the [applicants'] situation," *see Sebastian-Sebastian*, 87 F.4th at 847 (citation omitted), the BIA must consider on remand whether, "even if the gang was motivated by monetary gain, that reason was [inextricably] intertwined with [the Petitioners'] familial relationship" to their parents and thus their family-based PSG, *see Perez Vasquez*, 4 F.4th at 225.

### ii. Eleazar

In addition to the gang members, the Petitioners also asserted that they had a well-founded fear of future persecution from their uncle Eleazar. Beky credibly testified that Eleazar had harmed and perhaps raped a female cousin with whom the Petitioners had lived, and the IJ described Eleazar as a "pedophile" both in her written opinion and during the course of the proceedings. The BIA upheld the IJ's determination that "the respondents were not and will not be targeted by the gangs or their uncle because of their membership in a [PSG], or any other protected ground." And in affirming the IJ's denial of withholding of removal, the BIA stated that, "[w]hile the [Petitioners'] uncle previously harmed their cousin and became 'upset' that the [Petitioners] left Guatemala, the Immigration Judge concluded without clear error that this evidence is insufficient to establish that he will target them based on their family membership."

Where, as here, the BIA "merely paraphrased the IJ's findings and expressly concurred with [the IJ's] decision," we "review the decision of the IJ while considering any additional analysis by the BIA." *Ventura-Reyes v. Lynch*, 797 F.3d 348, 358 (6th Cir. 2015). In characterizing Eleazar as merely being "upset", the IJ—and thus the BIA when it "discern[ed] no clear error"—failed to consider all of the relevant evidence in the record. *See Juan-Pedro v. Sessions*, 740 F. App'x 467, 470 (6th Cir. 2018) (holding that IJs and the BIA cannot adopt a "myopic view of the record" and "ignore[] declarations and other materials" that tie a persecutor's actions to a protected ground).

The BIA's myopic finding that Eleazar "was upset" that Beky was in the United States was based on Ovidio's statement, but Ovidio also mentioned that he "learned that [Eleazar] hoped to kidnap the [Petitioners] and hold them for ransom." Furthermore, Ovidio explained that Eleazar, who "has harmed many girls," also "could kidnap [the Petitioners] because their parents, myself and Elodia, are in the U.S." And being kidnapped and held for ransom—especially by a pedophile—obviously constitutes persecution. *See, e.g.*, *Kaur v. Wilkinson*, 986 F.3d 1216, 1223 (9th Cir. 2021) ("Similarly, because kidnapping involves the extreme loss of bodily autonomy, attempted kidnapping can constitute persecution.").

The IJ acknowledged these facts in the portion of her opinion summarizing Ovidio's statement, but then failed to take them into account in her analysis. Her written opinion provided no explanation as to why she believed Eleazar was targeting the Petitioners and, at most, appeared to assume that Eleazar's motives were solely because of his pedophilia. But a pedophile, like any other persecutor, can have multiple reasons for his actions, and nothing suggests that Eleazar was sexually assaulting all of the children in town indiscriminately. Rather, the only child identified in the record as being harmed by Eleazar was one of the Petitioners' cousins who, like the Petitioners, is a member of the Rodas family.

And in contrast to the IJ's assumption that Eleazar was "upset" solely because he wanted to sexually assault the Petitioners, Ovidio stated that Eleazar was in fact "hop[ing] to kidnap [them] and hold them for ransom" specifically "because their parents, myself and Elodia, are in the U.S." Thus, even if the Eleazar were planning to sexually assault the Petitioners once he kidnapped them, the IJ and the BIA erred in simply finding that he had only one possible motive (pedophilia) "and prematurely en[ding] [their] analysis there" without considering whether he might have other reasons for targeting the Petitioners in particular. *See Sebastian-Sebastian v. Garland*, 87 F.4th 838, 848 (6th Cir. 2023) (cleaned up).

We see no meaningful distinction between Eleazar and the persecutor in *Bi Xia Qu*, who kidnapped the applicant in part to pressure the applicant's father to repay a debt. 816 F.3d at 608. Nor is there any difference between Eleazar and the persecutor in *Perez Vasquez*, who targeted the applicant to obtain the money that the applicant was receiving from her husband in the United States. 4 F.4th at 225. As in *Perez Vasquez*, even if Eleazar was motivated in large

part because of his pedophilia and greed, those reasons are "[inextricably] intertwined" with the Petitioners' family membership because he was targeting them—rather than other children—specifically because of their relationship to their U.S.-based parents. *See id.* The BIA therefore must address on remand whether the Petitioners' family status "underlay all of [Eleazar's] actions." *See Sebastian-Sebastian v. Garland*, 87 F.4th at 849 (cleaned up).

### d.    Proceedings on remand

The BIA's "denial of relief may be affirmed only on the basis articulated in the decision." *Daneshvar v. Ashcroft*, 355 F.3d 615, 626 (6th Cir. 2004); *see also Alcarez-Rodriguez v. Garland*, 89 F.4th 754, 762 (9th Cir. 2023) (noting that courts "cannot affirm the BIA on a ground upon which it did not rely") (citation and internal quotation marks omitted). Here, although the IJ believed that the Petitioners' experiences were "not egregious enough to constitute harm", the BIA "assum[ed], without deciding, that the harm rose to the level of persecution." We therefore cannot affirm the BIA's denial of the Petitioners' appeal on the basis of the IJ's "not egregious enough" conclusion.

Although this court has, on rare occasions, upheld the BIA's decision "on the basis of harmless error if the petitioner's prospects are otherwise so weak that there is no reason to believe . . . remand might lead to a different result," *Abdulahad v. Garland*, 99 F.4th 275, 295 (6th Cir. 2024), this is not one of those rare instances. Threats alone typically do not amount to persecution, but "immediate and menacing" threats can be sufficient even if they are unaccompanied by other harm or punishment. *Japarkulova v. Holder*, 615 F.3d 696, 701 (6ᵗʰ Cir. 2010). And, as this and other courts have held, "immigration judges should consider the age of a child applicant when assessing whether he or she suffered persecution or legitimately fears future persecution." *Nabhani v. Holder*, 382 F. App'x 487, 492 (6th Cir. 2010); *see also Zhang v. Gonzales*, 408 F.3d 1239, 1247 (9th Cir. 2005) ("[T]he harm a child fears or has suffered . . . may be relatively less than that of an adult and still qualify as persecution." (citation omitted)); *Kholyavskiy v. Mukasey*, 540 F.3d 555, 571 (7th Cir. 2008) ("[T]he BIA had an obligation to evaluate the impact of [the harm] on a child between the ages of eight and thirteen.").

Here, nothing suggests that the IJ accounted for the Petitioners' young ages in concluding that they were not persecuted. Nor did she consider whether children whose cousins had been kidnapped by gang members would have reasonably found the gang's threats to be particularly "immediate and threatening." *See Japarkulova*, 615 F.3d at 701. And the IJ's statement that a gang member merely "grabbed either Beky or Engly by the hand" minimizes the fact that the gang (1) forcibly separated the Petitioners, (2) "grabbed [the Petitioners'] hands behind [their] back" so they could not escape, and (3) refused to release them until Beky agreed to their demands. We therefore cannot say that the threats in this case, combined with the forced separation of the Petitioners, are so unlikely to be "immediate and threatening"—especially in light of the Petitioners' young ages—as to warrant affirming on the basis of harmless error. On remand, the BIA may either address the persecution question itself or remand to an IJ for further consideration, but it must do so in accordance with the caselaw discussed above.

We also note that neither the IJ nor the BIA addressed whether the Guatemalan government was unable or unwilling to control the Petitioners' persecutors. Although the IJ concluded that the Guatemalan government would not acquiesce to torture in denying protection under the Convention Against Torture (CAT)—a form of relief that the Petitioners did not in fact seek—the "unable or unwilling" standard for asylum and withholding of removal is less demanding than the "acquiescence" standard for CAT. *See, e.g.*, *Azanor v. Ashcroft*, 364 F.3d 1013, 1019 (9th Cir. 2004) (acknowledging that "consent or acquiescence" as required by the CAT involves more than showing only "that public officials would be merely unable or unwilling to prevent torture by private parties"); *Mouawad v. Gonzales*, 485 F.3d 405, 413 (8th Cir. 2007) ("A government does not acquiesce in the torture of its citizens merely because it is aware of torture but powerless to stop it, but does cross the line into acquiescence when it shows willful blindness toward the torture of its citizens by third parties.") (citations and internal quotation marks omitted).

The question of whether the Guatemala government was unwilling or unable to control the Petitioners' persecutors is thus a question that the BIA should remand to an IJ. *See* 8 C.F.R. § 1003.1(d)(3)(iv)(A) ("The Board will not engage in factfinding in the course of deciding cases[.]"); *see also Turcios-Flores v. Garland*, 67 F.4th 347, 358–59 (6th Cir. 2023) (noting that

"the IJ should make [factual determinations] in the first instance"). Given that the IJ in this case spent much of the proceedings repeatedly emphasizing her contempt for and hostility towards the Petitioners' mother, this case is one in which assignment to a different IJ on remand is appropriate. *See Mapouya v. Gonzales*, 487 F.3d 396, 415–16 (6th Cir. 2007) (instructing the BIA to assign the case to a different IJ even where the applicant did not argue that the IJ was biased); *see also Serrano-Alberto v. Attn'y Gen.*, 859 F.3d 208, 226 (3d Cir. 2017) (urging assignment to a different IJ because "[c]onduct by an Immigration Judge that can be perceived as bullying or hostile can have a chilling effect on a respondent's testimony and thereby limit his or her ability to fully develop the facts of the claim") (citing *Matter of Y-S-L-C-,* 26 I.&N. Dec. 688, 690 (B.I.A. 2015)). But because the Petitioners did not exhaust their challenge to the IJ's determination that "Guatemalan female children without parental protection" is not cognizable, any such remand is limited to their claims based on their membership in the Rodas family.

### 2. *Withholding of removal*

Finally, we turn to the Petitioners' withholding-of-removal claims. This court has recognized that, "[w]hereas an asylum claim requires that a statutorily protected ground be 'at least one central reason' for alleged persecution, a withholding of removal claim requires only that a statutorily protected ground be 'a reason' for alleged persecution." *Sebastian-Sebastian v. Garland*, 87 F.4th 838, 851 (6th Cir. 2023) (internal citations omitted). And given that "'a reason' is different from—and weaker than—'a central reason,'" an applicant who has satisfied the nexus requirement for asylum necessarily satisfies the less stringent nexus requirement for withholding of removal. *Guzman-Vazquez v. Barr*, 959 F.3d 253, 272 (6th Cir. 2020).

The BIA must, for the reasons discussed previously, apply a mixed-motives analysis to determine whether the Petitioners' family membership was "one central reason" for their persecution. *See* Part II.D.1, *supra*. And because the "a reason" standard is less demanding than the "one central reason" standard, the BIA must similarly reconsider whether the Petitioners have satisfied the nexus requirement for withholding of removal.

## III. CONCLUSION

For all of the reasons set forth above, we **GRANT** the Petitioners' petition for review in part, **DISMISS** it in part, **VACATE** the BIA's denial of the Petitioners' application for asylum and withholding of removal, and **REMAND** for reconsideration consistent with this opinion.

———————————————

**CONCURRING/DISSENTING**

———————————————

GRIFFIN, Circuit Judge, concurring in part and dissenting in part. I agree that we must dismiss in part the petition for review because petitioners exhausted neither their due process claim nor their challenge concerning the particularity of their proposed "Guatemalan female children without parental protection" social group, and therefore I join Sections II.B. and II.C. of the majority opinion. However, I respectfully dissent from the majority opinion's resolution of the asylum and withholding-of-removal claims set forth in Section II.D. In my view, under the substantial-evidence standard, we should uphold the BIA's ruling that petitioners failed to establish a sufficient nexus between their persecution and their family membership to advance their claims. Because I would deny the petition for review as to those issues, I would not remand and thus concur in part and dissent in part.

I.

A.

We review the immigration court's factual findings—including the nexus determination here concerning the "Rodas-Ramirez family" particular social group—for substantial evidence. *See Turcios-Flores v. Garland*, 67 F.4th 347, 357 (6th Cir. 2023). Under this highly deferential standard, we may not disturb the BIA's nexus finding unless the record *compels* a conclusion that petitioners' kinship motivated the gang and their uncle to persecute them. *See id.* at 353–54, 357. Put differently, "to say that the Board *could* find circumstantial proof of persecution in a given case is not to say that it *must*, and we can only reverse the Board if the latter is true." *Cruz-Guzman v. Barr*, 920 F.3d 1033, 1037 (6th Cir. 2019) (internal quotation marks omitted). In my view, the record evidence does not compel a nexus conclusion in petitioners' favor.

Begin with the gang's treatment of petitioners. Beky testified that she interacted with gang members three times. On the first and second occurrences, gang members approached her on her way to school and asked if she wanted to "make money" by "help[ing] them sell candy," which she knew was code for drugs. She knew that "other girls" did so for the gang, but she

declined. On the third instance, the demand was the same (sell drugs), but the delivery was not. Gang members stopped Beky and Engly, separated the two, held their hands behind their backs, and said that "they knew why [Beky] didn't want to" sell drugs—because, in her words, "my parents were [in the United States] . . . [and] we had money." They told Beky that if she did not start selling drugs, she and her sister "would turn up with [their] tongues cut." Engly's written statement in support is of a piece: "[The gang] told her that . . . they [knew] why she didn't want to earn money, they thought that because our parents were living in the U.S."

Next consider the evidence concerning their uncle, Eleazar (an alleged gang member). Beky testified that her uncle "tried to hurt" one of her cousins, Marleni, but she did not know "if [Marleni] was raped or not." Petitioners' father, Ovidio, submitted a statement claiming that Eleazar "was upset that . . . Beky was in the United States," which he interpreted as meaning that Eleazar "had plans to harm her and was upset he didn't get to bring those plans to completion. [Ovidio] also learned that [Eleazar] hoped to kidnap the girls and hold them for ransom." And Ovidio attested that "Eleazar has harmed many girls and also could kidnap [petitioners] because their parents . . . are in the U.S."

With respect to the gang members, the BIA concluded this evidence demonstrates that the gang targeted petitioners "for personal reasons and criminal activity and they have not shown that one of the reasons they were harmed or have reason to fear harm in the future is a protected ground." That is, "the gang members were motivated by financial gain rather than an animus towards [their] family. . . . [T]he gang members never identified [petitioners] by name or said anything to indicate that they knew who they were or that they belonged to the Rodas-Ramirez family." The BIA acknowledged the gang members linked their threat to the family staying in the United States but still found that purported link insufficient because it did "not establish that the gang members had the intent to overcome [petitioners]' temporary lack of supervision." As for petitioners' uncle, the BIA found that Eleazar's prior infliction of a harm on a relative did not establish a causal connection to their entire family and that he did not, and would not, target them because of their familial status.

This record does not compel a conclusion to the contrary, as it is lacking evidence that the gang and/or petitioners' uncle "were motivated by a particular animus toward the

[Rodas-Ramirez] family itself, as opposed to an ordinary criminal desire for financial gain." *Id.* In other words, substantial evidence demonstrates that harming petitioners' family was "a *means* to achieve some other goal, not an *end* in itself," which "does not constitute persecution on account of family membership." *Majano-De Hernandez v. Barr*, 777 F. App'x 810, 812 (6th Cir. 2019) (internal quotation marks omitted). Or, as we said in *Lopez-Arias v. Barr*, "substantial evidence in the record indicates that [they were] targeted . . . as a means to access their wealth . . . from relatives living in the United States. This finding supports a conclusion that the . . . motivation to extort Petitioners based on their family identity was at most incidental or tangential to the central reason for their motivation." 777 F. App'x 793, 797 (6th Cir. 2019).

In sum, our caselaw makes clear that it is petitioners' burden to establish that their membership in a particular social group served as "one central reason" for the persecution, *Turcios-Flores*, 67 F.4th at 357 (citing 8 U.S.C. § 1158(b)(1)(B)(i)), and we may not disturb the BIA's no-nexus finding unless the record *compels* a conclusion otherwise, *id.* at 353–54. Indeed, in other instances of gang persecution, we have upheld such a no-nexus determination when there was "insufficient evidence that any gang member held any particular animus against [an asylum seeker's] family *based on some unique family characteristic.*" *Id.* (emphasis added and citation omitted). Here, the lack of any evidence demonstrating animus toward the petitioners' family because of their family's status dooms petitioners' claims.

B.

The majority opinion charts a different course, largely following the Fourth Circuit's decision in *Perez Vasquez v. Garland*, 4 F.4th 213 (4th Cir. 2021). It emphasizes, for example, that gang members did not directly extort or demand money from petitioners, that gang members were generally aware that petitioners' parents lived in the United States, and that gang members issued their first and only threat to petitioners upon learning that their family lived in the United States. And it places much weight on their uncle's threat to kidnap petitioners and hold them for ransom—which the majority opinion assumes would be paid by petitioners' parents.

But that analysis conflates the social groups at issue. It is well established that "belong[ing] to a group that is perceived . . . as having ready access to funds because of familial

ties [to] the United States" is insufficient to establish persecution on account of familial status. *See, e.g.*, *Sanchez-Robles v. Lynch*, 808 F.3d 688, 692 (6th Cir. 2015). The proposed social group at issue here is petitioners' family, and there is nothing in the record to compel the conclusion that the gang or petitioners' uncle was motivated by anything more than monetary gain. Indeed, the opposite is true, for one can reasonably infer the gang was motivated to make money when members demanded that Beky sell drugs for its benefit; its subsequent violent threats in response to Beky's refusal was, in my view, still just a "mean[]" and not an "end." *See Majano-De Hernandez*, 777 F. App'x at 812 (emphasis omitted). The same can be said for the uncle, who allegedly stated he wanted to "hold them for ransom" but did not connect that threat to the Rodas-Ramirez family.

The majority opinion also leverages the uncle's alleged rape of another cousin, but "absent a pattern of persecution tied to the [petitioners], acts of violence against family members do not necessarily demonstrate a well-founded fear of persecution." *Akhtar v. Gonzalez*, 406 F.3d 399, 405 (6th Cir. 2005) (citation omitted). It is also not correct to assert that the IJ "appeared to assume that Eleazar's motives were solely because of his pedophilia." Rather, the IJ wrote:

> Even if the vague threats Eleazar made in reference to them constituted harm, the evidence does not show that they were made to overcome Respondents' membership in the Rodas-Ramirez family. Eleazar did harm [Marleni], yes. But neither Respondent is [Marleni]. And simply because a member of a family has been harmed in the past does not mean that they—or any other family members— were targeted based on that membership.

Stated differently, the IJ concluded petitioners failed to demonstrate "that Eleazar targeted them based on their family membership." The IJ's subsequent reference in a footnote that "a pedophile's presence in one's family creates an opportunity for abuse" just provides a possible explanation for why abuse occurs. It is by no means is a finding that pedophilia motivated Eleazar's threats.

Nor does *Sebastian-Sebastian v. Garland* dictate a remand to consider a mixed-motives analysis. 87 F.4th 838 (6th Cir. 2023). There, we concluded that the BIA could have found a nexus to the petitioner's social groups and thus remanded for it to conduct a mixed-motives

analysis in light of its erroneous prior decision that the persecutor's motives were personal (and thus "inextricably intertwined" with her particular social groups). *Id.* at 849–50. But here, without any evidence linking the persecutors' "personal disputes" to petitioners' family because of their family's status—and which therefore does not rise to the level of a "central reason" for persecution—the BIA correctly concluded asylum was inappropriate. *See Zoarab v. Mukasey*, 524 F.3d 777, 781 (6th Cir. 2008); *see also Sagastume-Hernandez v. Garland*, 2022 WL 17998882, at \*4 (6th Cir. Dec. 30, 2022) ("A mixed-motive analysis still requires the petitioner to demonstrate that a protected ground motivated the persecution in part.") (citing *Guzman-Vazquez v. Barr*, 959 F.3d 253, 270, 274 (6th Cir. 2020)).

The majority opinion excuses the animus-toward-a-protected-ground requirement that is well grounded in our caselaw, *see Cruz-Guzman*, 920 F.3d at 1037–38, asserting instead that some of our older cases have "recognized that a mixed-motives analysis might be warranted even where a persecutor (1) has not demonstrated any animus or hostility towards the applicant's specific PSG, or (2) targets an applicant as a means to accomplishing some other end." I read those cases differently. In each, just like in *Sebastian-Sebastian*, we concluded that the record also supported a nexus finding. *See Bi Xia Qu v. Holder*, 618 F.3d 602, 608 (6th Cir. 2010); *Al-Ghorbani v. Holder*, 585 F.3d 980, 997–98 (6th Cir. 2009); *Kamar v. Sessions*, 875 F.3d 811, 818 (6th Cir. 2017). Factual differences in those cases do not license altering our precedent to the contrary.[1]

II.

The majority opinion also orders a reconsideration concerning petitioners' withholding-of-removal claim based on its conclusion that the record compels a finding that petitioners demonstrated "one central reason" for persecution. *See, e.g.*, *Guzman-Vasquez*, 959 F.3d at 272–73 (withholding-of-removal claim need only demonstrate the protected social group was "a reason"). I agree petitioners' success on this claim rises or falls with the nexus issue. And it should fall here for the reasons set forth above.

---

[1]And relatedly, those cases do not permit instructing the BIA that its recent *Matter of M-R-M-S-* decision—which was issued after the BIA ruled in this matter and arises under the law of the Tenth Circuit—is not good law. 28 I. & N. Dec. 757 (B.I.A. 2023). Because the majority opinion concludes a remand is in order, it is only prudent that the BIA be the first body to address the impact of *M-R-M-S-* on this case.

III.

For these reasons, I would dismiss in part and deny in part the petition for review.