RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0332p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

GUSTAVO ADOLFO OSABAS-RIVERA,

                                    *Petitioner,*

    *v.*

                                    No. 25-3168

PAMELA BONDI, Attorney General,

                                  *Respondent.*

─────────────

On Petition for Review from the Board of Immigration Appeals.
No. A 209 832 174.

Decided and Filed:  December 8, 2025

Before:  NALBANDIAN, DAVIS, and HERMANDORFER, Circuit Judges.

─────────────

**COUNSEL**

─────────────

**ON BRIEF:**  Margaret W. Wong, MARGARET WONG & ASSOCIATES LLC, Cleveland, Ohio, for Petitioner.  Jonathan S. Needle, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

─────────────

**OPINION**

─────────────

DAVIS, Circuit Judge.  Gustavo Adolfo Osabas-Rivera petitions for review of the Board of Immigration Appeals' final order affirming an immigration judge's decision finding him ineligible for asylum due to an untimely application and denying on the merits his applications for withholding of removal and protection under Article III of the Convention Against Torture. First, we lack jurisdiction to review the Board's determination that Osabas-Rivera failed to establish extraordinary circumstances warranting waiver of the deadline for his untimely asylum

application.  And second, we hold that Osabas-Rivera abandoned a dispositive issue as to his withholding-of-removal claim—specifically, whether the Honduran government is unable or unwilling to protect him from gang violence.  He does not raise his Convention Against Torture claim before us.  Therefore, we DENY the petition for review in part and DISMISS in part.

## I.

### A.  Factual Background

Gustavo Adolfo Osabas-Rivera is a native and citizen of Honduras.  He arrived in the United States on or around October 22, 2016.  Osabas-Rivera fled Honduras due to "MS" gang members targeting him and his brother, Eldon Osabas-Rivera.  (Administrative Record ("AR") 94–95).[1]  At his immigration hearing, Osabas-Rivera testified that MS infiltrated the fan clubs for soccer teams in Honduras and used the clubs to recruit people to join the gang.  Both Osabas-Rivera and Eldon supported a soccer team called Motagua.  MS members posing as fans of another soccer team, Olympia, threatened to kill Eldon if he did not switch his support to Olympia.[2]  Osabas-Rivera explained that MS's demand for soccer-team support was only a front for demanding that Eldon join their gang.  Eldon refused to join and fled to the United States shortly after MS's threats.  Once his brother left Honduras, MS began threatening Osabas-Rivera.  The gang demanded details about Eldon's whereabouts and threatened to retaliate if Osabas-Rivera did not cooperate.  Osabas-Rivera told gang members he did not know Eldon's location and therefore had no information to provide.  He paid "extortion" to MS for about a year and a half to avoid any harm to him or his family.  (AR 98).

In 2013, MS kidnapped Osabas-Rivera for approximately four hours.  Gang members beat him, cut his cheekbone and eyebrow, pointed guns at his head, and hit him in the back of the head with the butt of a gun.  MS did all this for "gang pride," not money.  (AR 99).  The gang warned him that if he did not give them his brother's location, he would pay for it with his life or

---

[1]As the government indicates, parts of the AR refer to "Eldon" as "Elvin."  We follow the immigration judge's spelling of "Eldon."

[2]Parts of the AR also refer to "Olympia" as "Olimpia."  We follow the immigration judge's spelling of "Olympia."

his family members' lives.  Fearing for his life, he promised to find out his brother's location.  Osabas-Rivera did not seek medical treatment for his injuries sustained in the kidnapping.

The next morning, Osabas-Rivera fled with his family to Choluteca.  He reported the kidnapping to the police in Choluteca, who transferred his report to San Pedro Sula where the kidnapping occurred.  But doing so only made matters worse because, according to Osabas-Rivera, the police are "corrupt" and associated with Honduran gangs.  (AR 103).  Four or five months after moving to Choluteca, MS began texting Osabas-Rivera, informing him they knew he had moved.  MS named his neighborhood but demanded more details about his exact location.  Gang members also stated that if they found Osabas-Rivera, they would kill him.  Afraid that reporting the threats to the police would escalate them, he did not report the text messages.  While he could not point to any evidence suggesting that the police had told the gang members where he had moved, he assumed that the police had done so.  Osabas-Rivera had no further contact with the gang outside of the text messages and never saw any members in person.  After a few years in Choluteca, Osabas-Rivera and his family moved to a rural area outside of Choluteca called El Triunfo.

Feeling unsafe in El Triunfo, Osabas-Rivera fled to the United States, leaving his family behind.  After he arrived, his wife's cousin informed him that she had received text messages asking where his wife was located.  His wife then told him that MS knew that his family was not in Choluteca anymore and that he was not with them.  Once Osabas-Rivera's family joined him in the United States in 2019, his father told him that MS was looking for him but knew that he and his family had fled to the United States.  Osabas-Rivera fears that if he were to return to Honduras even now, MS would seriously harm or kill him because he made a "fool" of them by fleeing to the United States.  (AR 108).

**B.  Procedural Background**

On November 21, 2016, the Department of Homeland Security initiated removal proceedings against Osabas-Rivera by filing a Notice to Appear ("NTA").  The NTA charged that he was subject to removal pursuant to the Immigration and Nationality Act § 212, 8 U.S.C. § 1182(a)(7)(A)(i)(I).  In his credible-fear interview with an asylum officer, he explained that a

"criminal group" had "threatened" and "extorted" him because his brother refused to join the group and fled to the United States. (AR 391). The asylum officer found that Osabas-Rivera had demonstrated a credible fear of persecution and referred him to an immigration judge ("IJ") for adjudication in removal proceedings.

At his first hearing on December 1, 2016, through counsel, Osabas-Rivera admitted to the facts about his October 2016 arrival, conceded the charge of removability, and declined to designate a country of removal. The IJ found him removable and designated Honduras as the country of removal. Osabas-Rivera indicated that he intended to apply for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). At his second hearing on June 21, 2017, Osabas-Rivera appeared unrepresented. During that hearing, the IJ informed him that he had to file his asylum application by October 22, 2017—one year after his arrival in the United States. He retained new counsel roughly thirteen months after that hearing, on July 26, 2018. Osabas-Rivera then filed for asylum and withholding of removal on December 19, 2018, about fourteen months past the statutory deadline for his asylum application. He asserted membership in two particular social groups ("PSGs"): "the family of El[don] Osabas-Rivera" and "residents of Honduras who report gang activity to the police." (AR 84, 283–84).

On November 15, 2022, Osabas-Rivera testified at a merits hearing before an IJ. The IJ found his testimony credible and adopted it "as the factual findings in this case." (AR 41). With respect to his untimely asylum application, Osabas-Rivera explained that he was "very depressed" because his family still was in Honduras, and he could not protect them. (AR 91). And he was afraid that MS would retaliate against him by harming his family. He decided to obtain new counsel and file his asylum application once his family arrived in the United States. The IJ found that he had not demonstrated "exceptional circumstances that would justify the untimely application." (AR 93). The IJ explained that although Osabas-Rivera was "upset" because he was separated from his family, "that is a fairly common circumstance with most, at least the vast majority, almost all asylum seekers." (*Id.*). Further, the IJ considered that (1) Osabas-Rivera never sought medical treatment for his depression, and (2) in his asylum application, he identified his financial struggles as the reason he did not timely file.

Having found the asylum application untimely, the IJ issued a decision denying only the applications for withholding of removal and relief under CAT.  First, the IJ determined that the harm Osabas-Rivera suffered was insufficiently severe to meet the standard for persecution.  The IJ then found that, even if he had established past persecution, this persecution lacked a nexus to his proposed PSGs.  The IJ determined that Osabas-Rivera did not establish that "the family of Eldon Osabas-Rivera" PSG was socially distinct or that it had a nexus to his persecution.  (AR 41).  The IJ explained that this PSG lacked a nexus because gang members carried out no threats or demands for extortion against Osabas-Rivera's brother and father (i.e. other family members of Eldon), who continued to reside in Honduras.  And as to the "residents of Honduras who report gang activity to the police" PSG, the IJ found that it "can be seen as cognizable" but also lacked a nexus because Osabas-Rivera had not established that the threats following the police report were due to him filing a report.  (AR 41–42).  Consequently, he had failed to show that the report was "a central reason or a reason" for the persecution.  (AR 42).

Next, the IJ determined that Osabas-Rivera failed to show that the Honduran government is unable or unwilling to protect him because he provided no information on whether the San Pedro Sula police followed up about the kidnapping and beating.  He also declined to file another report when he continued receiving threats in Choluteca, thus depriving the government of an opportunity to act.  Finally, the IJ determined that Osabas-Rivera failed to establish a well-founded fear of future persecution because he did not explain why he could not relocate within Honduras six years after the kidnapping.  The IJ found that "a general fear of harm due to the gangs being pervasive throughout the country" was not enough.  (AR 43).

Osabas-Rivera appealed the IJ's decision.  The Board of Immigration Appeals ("BIA") affirmed the IJ's decision in a separate opinion.  As an initial matter, the BIA explained in a footnote that Osabas-Rivera "waived" any challenge to the IJ's denial of his CAT claim by failing to "meaningfully challenge[] this determination on appeal."  (AR 3).[3]  As to his untimely asylum application, the Board affirmed the IJ's extraordinary-circumstances determination.

---

[3]We do not address the BIA's denial of Osabas-Rivera's application for relief under the CAT because he does not pursue any challenges to this decision on appeal.  And, as the BIA noted, Osabas-Rivera forfeited this issue because he did not raise it in his briefing filed with the BIA.  *See Cuevas-Nuno v. Barr*, 969 F.3d 331, 334–35 (6th Cir. 2020) (citing *Hassan v. Gonzales*, 403 F.3d 429, 433 n.5 (6th Cir. 2005)).

It specifically explained that Osabas-Rivera "did not establish serious illness or mental disability, or comparable circumstances" in the one year after his arrival. (AR 4). The BIA then determined that Osabas-Rivera's "broad allegation" in his Notice of Appeal failed to specify a clear factual or legal error, meaning that he also "waived" any challenge to the IJ's determination as to whether the Honduran government is unable or unwilling to protect him from the gangs. (*Id.*). This failing, said the BIA, "is dispositive of [Osabas-Rivera's] claims for asylum and withholding of removal." (*Id.*). Lastly, the Board held that the IJ did not clearly err in determining that: (1) Osabas-Rivera's "past harm is not sufficiently severe to rise to the level of persecution," (2) he demonstrated neither a well-founded fear of persecution nor a clear probability of future persecution, and (3) he failed to establish that he could internally relocate within Honduras. (*Id.*).

Osabas-Rivera timely petitioned for review.

## II.

### A. Timeliness of Osabas-Rivera's Asylum Application

The BIA agreed with the IJ that Osabas-Rivera had not demonstrated "extraordinary circumstances," such as serious illness or mental disability, to excuse the untimely filing of his asylum application. (AR 4). Osabas-Rivera does not dispute that his application was untimely. Rather, he contends that the IJ and BIA erred in applying "the legal standard for an exception to a one-year filing deadline to undisputed or established facts." (Petitioner's Br., ECF 15, 17). The government asserts that we lack jurisdiction to review the BIA's determination because Osabas-Rivera "does not raise a colorable legal question or constitutional claim with respect to the timeliness of his asylum application." (Respondent's Br., ECF 16, 20). We agree.

As an initial matter, Osabas-Rivera apparently takes issue with the IJ's conclusion regarding the depth of his depression. He contends that he "was so depressed he did not want to seek asylum." (Petitioner's Br., ECF 15, 18). And the IJ minimized his condition when characterizing his state as merely "upset." (*Id.* at 14, 17). But we cannot address factual questions brought up in the context of claims for discretionary relief. *See Singh v. Rosen*, 984 F.3d 1142, 1149 (6th Cir. 2021) ("An immigrant cannot avoid a jurisdictional limit by 'labeling'

a Board's discretionary or factual finding as a ruling on a legal or mixed question." (citation omitted)). And findings concerning Osabas-Rivera's mental state are not meaningfully different from the factual determination of whether an individual "ha[s] a serious medical condition," which the Supreme Court has recognized as unreviewable. *Wilkinson v. Garland*, 601 U.S. 209, 222 (2024) (citing *Patel v. Garland*, 596 U.S. 328 (2022)).

But Osabas-Rivera has a more fundamental problem with his argument for review. Based on *Wilkinson*'s guidance and our own recent caselaw, we conclude that the extraordinary-circumstances determination under 8 U.S.C. § 1158(a)(2)(D) lies within the discretion of the Attorney General. Therefore, we lack jurisdiction to review the BIA's ultimate decision that Osabas-Rivera failed to establish extraordinary circumstances here.

Begin with the statute. An applicant must demonstrate by clear and convincing evidence that his application for asylum was filed within one year of his arrival in the United States. 8 U.S.C. § 1158(a)(2)(B); 8 C.F.R. § 1208.4(a)(2)(i)(A). If the applicant fails to file his application within one year, his application still may be considered if he "demonstrates *to the satisfaction of the Attorney General* either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application." 8 U.S.C. § 1158(a)(2)(D) (emphasis added). Osabas-Rivera frames his argument around changed circumstances. But seemingly more relevant here is the potential for extraordinary circumstances, which may include "[s]erious illness or mental or physical disability." 8 C.F.R. § 1208.4(a)(5)(i). Regardless, the applicant must file his asylum application "within a reasonable period given those 'changed circumstances.'" *Id.* § 1208.4(a)(4)(ii).

As we recently observed in *Rahman v. Bondi*, "[t]he immigration laws regulate the jurisdiction of courts in complex ways." 131 F.4th 399, 405 (6th Cir. 2025). We are prohibited from exercising "jurisdiction to review any determination of the Attorney General under paragraph (2)" of 8 U.S.C. § 1158(a). 8 U.S.C. § 1158(a)(3). Yet, Congress has implemented a "safe harbor" granting federal courts jurisdiction to review "constitutional claims or questions of law." *Singh*, 984 F.3d at 1148 (quoting 8 U.S.C. § 1252(a)(2)(D)).

In *Singh*, we outlined the contours of § 1252(a)(2)(D) according to the type of issue presented. *Id.* at 1148–49 (addressing jurisdiction within the context of the cancellation-of-removal statute). By its language, the safe harbor permits us to review purely legal questions, such as the BIA's interpretation of a statute. *Id.* at 1149. And the Supreme Court has held that the safe harbor also applies to mixed questions of law and fact, including whether the BIA correctly applied the law to undisputed facts. *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 227–28 (2020) (concluding that petitioners' claims of due diligence for equitable tolling purposes were reviewable questions of mixed law and fact); *Wilkinson*, 601 U.S. at 212 (permitting review of the "exceptional and extremely unusual hardship" standard for cancellation of removal as applied to undisputed facts). In contrast, we are barred from reviewing pure questions of fact, such as the credibility of a testifying witness—and as noted above, the seriousness of an individual's medical or mental illness. *See Wilkinson*, 601 U.S. at 225. We also lack jurisdiction to review discretionary questions, such as the BIA's final denial of cancellation of removal despite the applicant satisfying all four eligibility factors. *See Singh*, 984 F.3d at 1149 (citing 8 U.S.C. § 1252(a)(2)(B)(ii)).

We previously held that § 1252(a)(2)(D) bars jurisdiction over "review of asylum applications denied for untimeliness only when the appeal seeks review of discretionary or factual questions, but not when the appeal seeks review of constitutional claims or matters of statutory construction." *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006) (holding that the court lacked jurisdiction to review the petitioner's claim that the "IJ incorrectly applied the 'changed circumstances' provision"). And in *Khozhaynova v. Holder*, we chose not to revisit *Almuhtaseb* absent an intervening Supreme Court decision. 641 F.3d 187, 192 (6th Cir. 2011) (declining to extend jurisdiction where the petitioner asserted that her claim presented a "mixed question of fact and law").

But after the Supreme Court decided *Guerrero-Lasprilla*, we acknowledged our jurisdiction to review whether a petitioner "filed his asylum application within a reasonable period of time given the circumstances based on the undisputed facts of his case." *Audi v. Barr*, 839 F. App'x 953, 959–60 (6th Cir. 2020) (recognizing that *Guerrero-Lasprilla* "effectively overrul[ed]" *Almuhtaseb*). There, we focused our analysis on the "reasonable period of time"

standard and did not address the extraordinary-circumstances determination because neither the IJ nor BIA decided this issue. *Id.* at 960.

As we noted in *Rahman*, however, most circuits have held that the "to the satisfaction" language in § 1158(a)(2)(D) renders the Attorney General's extraordinary circumstances determination "*unreviewable*" because it is a "'discretionary' decision." 131 F.4th at 408 (collecting cases from the Third, Seventh, Eighth, Tenth, and Eleventh Circuits but noting that the Ninth Circuit decided the issue differently). With the exception of *A.P.A. v. U.S. Attorney General*, 104 F.4th 230, 241 (11th Cir. 2024), the cases cited were decided prior to *Guerrero-Lasprilla* and *Wilkinson*. In *A.P.A.*, the Eleventh Circuit made the point that § 1158(a)(2)(D) does "more than just say the Attorney General must 'determine' whether 'changed circumstances' exist." *Id.* The statute also links "the existence of 'changed circumstances' to the 'satisfaction of the Attorney General.'" *Id.* Indeed, *Wilkinson* contemplated the same operative language—"to the satisfaction of the Attorney General"—in two other provisions and concluded that they exemplified discretionary decisions over which the courts of appeals have no jurisdiction. *Id.* (citing *Wilkinson*, 601 U.S. at 224). At least two other circuits—the First and the Third—have since agreed with *A.P.A.*'s jurisdictional analysis and declined review over § 1158(a)(2)(D) determinations. *See Zapet-Alvarado v. Bondi*, 152 F.4th 329, 336 (1st Cir. 2025); *Real v. Att'y Gen.*, 147 F.4th 361, 366–68 (3d Cir. 2025).

In *Rahman*, we noted *Wilkinson*'s "differential treatment" of provisions that include the "to the satisfaction" language, 131 F.4th at 407, and "opt[ed] to follow the many other circuit courts that have interpreted this language," *id* at 408. Thus, after analogizing to the extraordinary-circumstances inquiry for untimely asylum applications, we declined to review the BIA's "discretionary conclusion" that Rahman's factual circumstances satisfied the extreme-hardship inquiry for fraud and readmission waivers. *Id.* at 406, 408. And we recently reemphasized the import of the "to satisfaction of the Attorney General" language in *Sarkisov v. Bondi*, noting it "conveys that the Attorney General's designees must make an 'inherently discretionary' call" outside our jurisdiction to review. --- F.4th ----, 2025 WL 3251118, at *5 (6th Cir. 2025) (quoting *Rahman*, 131 F.4th at 407).

What does that mean to our analysis here?   Although we did not have occasion in *Rahman* to squarely resolve the question of our jurisdiction to review the BIA's extraordinary-circumstances determination for untimely asylum applications, our reasoning there informs our decision here.   Osabas-Rivera is required to show "to the satisfaction of the Attorney General" that his depression created an extraordinary circumstance sufficient to warrant waiver of the one-year application deadline.   *See* 8 U.S.C. § 1158(a)(2)(D).   Just as that language rendered the BIA's extreme-hardship determination discretionary in *Rahman*, it signifies that the BIA's conclusion on extraordinary circumstances is also discretionary.   As a result, we lack jurisdiction to review whether Osabas-Rivera has shown extraordinary circumstances to justify filing his asylum application more than two years after arriving in the United States.   We thus shift our attention to consider his withholding-of-removal claim below.

## B.  Withholding of Removal

*Standard of Review.*   We review the Board's legal conclusions de novo and its factual findings under the substantial-evidence standard.   *Saleh v. Garland*, 100 F.4th 742, 746 (6th Cir. 2024) (citing *Umana-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013)).   Where, as here, the Board reviews the IJ's decision and issues a separate opinion, rather than summarily affirming, we review the Board's decision as the final agency determination.   *Id.*   The BIA's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."   *Patel v. Bondi*, 131 F.4th 377, 380 (6th Cir. 2025) (quoting 8 U.S.C. § 1252(b)(4)(B)).   And "[i]t follows that any issues the Board did not address are not before the court."   *Turcios-Flores v. Garland*, 67 F.4th 347, 353 (6th Cir. 2023).

*Merits Analysis/Failure to Exhaust.*   To qualify for withholding of removal, among other things, Osabas-Rivera must establish that his "life or freedom would be threatened" in Honduras "because of" his "membership in a particular social group."   8 U.S.C. § 1231(b)(3)(A).   He claims that the BIA's decision on this issue is not supported by substantial evidence in the record on several fronts.   But his claim fails on a different elemental issue.

At the outset, the government argues that Osabas-Rivera failed to exhaust a dispositive requirement of his withholding-of-removal claim.   Namely, Osabas-Rivera did not challenge the

IJ's finding that he failed to show that the Honduran government cannot or will not protect him from gang members. The BIA recognized this shortcoming, noting that Osabas-Rivera "waived" the government-protection issue because he did "not meaningfully challenge[] this aspect of the [IJ's] decision" in his brief filed with the BIA. (AR 4). We agree.

We may review final orders of removal only if the petitioner "has exhausted all administrative remedies available to [him] as of right." 8 U.S.C. § 1252(d)(1). Section 1252(d)(1) is a claims-processing rule subject to forfeiture and waiver—not a jurisdictional limit. *Mazariegos-Rodas v. Garland*, 122 F.4th 655, 664 (6th Cir. 2024) (citing *Santos-Zacaria v. Garland*, 598 U.S. 411, 417–23 (2023)). But we only consider claims raised in the applicant's brief before the BIA. *Cuevas-Nuno v. Barr*, 969 F.3d 331, 334–35 (6th Cir. 2020) (citing *Hassan v. Gonzales*, 403 F.3d 429, 433 n.5 (6th Cir. 2005)). This holds true, even if the applicant raises the issue in his Notice of Appeal to the BIA. *Id.* at 335.

To establish "persecution" in a claim for withholding of removal, an applicant must show that his "feared harm [was] inflicted either by the government or by private parties that the government is unable or unwilling to control." *Palucho v. Garland*, 49 F.4th 532, 535–36 (6th Cir. 2022) (citation modified). In his brief filed with the BIA, Osabas-Rivera neither addressed nor disputed the IJ's finding that he failed to establish that the Honduran government is unable or unwilling to protect him from MS. Although he perfunctorily mentioned this issue in his Notice of Appeal to the BIA, we look only to his brief filed with the BIA to determine which claims he adequately raised. *See Cuevas-Nuno*, 969 F.3d at 334–35.

Because the government has properly raised this issue in its briefing, we are constrained from addressing Osabas-Rivera's arguments regarding the legal standard that the IJ and BIA applied to analyze this issue. *Mazariegos-Rodas*, 122 F.4th at 664 ("Claim-processing rules, however, 'may be mandatory in the sense that a court must enforce the rule if a party properly raises it.'" (quoting *Fort Bend County. v. Davis*, 587 U.S. 541, 549 (2019))). We therefore conclude that Osabas-Rivera forfeited this argument. And without a showing that the Honduran government is unable or unwilling to protect him from gangs, Osabas-Rivera's withholding-of-removal application necessarily fails. We thus need not reach his remaining arguments.

## III.

For these reasons, we DENY the petition in part and DISMISS in part.